74 F.Supp.2d 876 (1999)
Thomas A. SWOPE, et al., Plaintiffs,
v.
SIEGEL-ROBERT, INC., Defendant.
No. 4:97CV02016ERW.
United States District Court, E.D. Missouri, Eastern Division.
June 23, 1999.
*877 *878 *879 John R. Musgrave, Thompson Coburn, St. Louis, MO, Lawrence C. Friedman, Partner, Kevin A. Sullivan, Thomas J. Green, Thompson Coburn, St. Louis, MO, for Plaintiffs.
Jackson D. Glisson, III, Greensfelder And Hemker, St. Louis, MO, Joel A. Poole, S. Jay Dobbs, Polsinelli and White, St. Louis, MO, Gerald R. Ortbals, Stinson and Mag, St. Louis, MO, for Defendant Siegel-Robert, Inc.
Kathleen R. Sherby, Jennifer M. Arthur, Bryan Cave LLP, St. Louis, MO, for movants.

MEMORANDUM AND ORDER
WEBBER, District Judge.
This matter is before the Court on Plaintiffs'[1] complaint under R.S.Mo. § 351.455 seeking the Court's "fair value" determination of their shares in Siegel-Robert, Inc., a Nevada corporation.[2] Hereinafter, the reference to Siegel-Robert, Inc. shall be the "Company." The Court makes Findings and Conclusions pursuant to Fed.R.Civ.P. 52.

I.
This is, in its most basic sense, a proceeding to determine the "fair value" of the shares of minority interest shareholders who were "squeezed-out" in a corporate merger on the 31st day of July, 1997, when Siegel-Robert, Inc., a Missouri Corporation, became merged with Siegel-Robert, Inc., a Nevada Corporation. The minority interest shareholders[3] were forced to sell their shares to the newly formed Nevada corporation at the price of $20.00 per share. While they could not refuse to surrender their shares, receive stock in the newly formed Nevada corporation, or reject the price of $20.00 per share offered by the Company for their shares, R.S.Mo. § 351.455 provides a procedure whereby they can, through a judicial proceeding, determine the fair value of the shares as of the day before the merger date of July 31, 1997, and force the Company to pay the fair value for those shares. Plaintiffs provided written notice to Siegel-Robert, Inc., a Missouri corporation, of their objection to the merger proposal before the shareholders voted on the proposal, and voted in opposition to the merger. They made the required written demand upon the newly formed Siegel-Robert, Inc., a Nevada corporation, for the fair value of their respective shares. When the parties were unable to agree on a sum to be paid for the shares beyond the $20.00 per share amount, this lawsuit followed.
The history of the Company reflects a true American success story. The original Company was formed in 1946 by Mr. Bruce Robert as a part time enterprise, operating in a make-shift room where objects were chrome-plated for a very limited market. Mr. Robert was a wise businessman who recruited capable associates who had a major impact on the Company's successful development. O.W. Schneider, Jr., deceased, worked for the Company for 40 years. He helped build the Company through his technical expertise. He had a working knowledge of factory building and *880 acquisition and disposition of the equipment, and he was very adept at supervising people. Mr. Schneider was permitted to acquire an ownership interest in the business which he had helped build. His shares were acquired in the 1970's and 1980's.
The Company began to experience substantial growth in the 1980's when it began to diversify. The Company began an aggressive diversification program because the Siegel-Robert Automotive and Appliance Division is engaged in a very cyclical business where demand for its products varies with the fortunes of the economy and where profit margins are lower than for companies in the technology field. In this very competitive industry, customers for its products accept the lowest bids, and the Automotive and Appliance Division continuously is required to lower its prices and become more productive. In 1993, 74% of gross revenues were attributable to the automotive industry component of the Company. By contrast, in 1997, the subsidiaries accounted for 42% of the gross revenue. Management's plans to spread risks and enhance profitability of the Company have succeeded. In 1981 annual sales of sixty million dollars were comprised of fifty-five million dollars from automotive products. Business was cyclical, and at that time was adversely impacted by the grain embargo. Management saw the importance of considering diversification of the Company and began looking at acquisition candidates in manufacturing that sold to customers other than retail. They were looking at companies in a relatively close geographic area involved in unsophisticated technology, typically in a radius of 400 miles from St. Louis. The Company wanted to maintain close personal relationships with management of acquired companies on a long-term basis.
The Company is now primarily composed of the following six business units:
1. Siegel-Robert Automotive and Appliance Division[4]  Founded in 1946, it is located in St. Louis, Missouri, and is involved in the auto part industry, producing grilles, consoles, exterior mirrors, shift indicators, decorative decals, and interior moldings to original automotive manufacturers. It produces "value added parts."
2. Advantek  Founded in 1978 and acquired in 1992, this company is involved in packaging material for semi-conductors. It is located in Minnesota and sells carrier tape, cover tape, and integrated circuit test handlers.
3. Continental Disc Corporation  Established in 1965 and acquired in July, 1988, this company produces custom rupture discs and over pressure release devices and vacuum relief devices used in industrial environments.
4. Correl, Inc.  Founded in 1969 and acquired in 1982, this company, located in Charleston, Arkansas, manufactures stacking chairs, multi-purpose folding tables, bookcases and computer furniture. It is classified in the furniture industry.
5. Dolch Computer Systems, Inc.  Founded in 1987 and acquired in February, 1996, located in Freemont, California, this company manufactures a specialized line of industrial portable computers. It also packages for resale touch-screen flat panel displays. It is classified in the portable industrial computer industry. Dolch Computer Systems is the Company's largest acquisition.
6. Sensidyne, Inc.  Founded in 1983 and acquired in 1990, this company is located in Clearwater, Florida and *881 manufactures toxic gas detection systems. It is in the analytical instrumentation and measurement industry.
The first Company acquisition, occurring on May 17, 1982, was Correl, Inc., a small company manufacturing a very simple product line consisting of a folding leg table. This office furniture division has little leverage in pricing because its primary customers are chain stores. The company had $3 million in sales in 1982 and over $20 million in 1997. It now employs approximately 190 persons. The division has competent management. O.W. Schneider, Jr., was brought in to help with the manufacturing methods at Correl. There is little, if any, efficiency to be gained in the manufacturing process at Correl. Customers of Correl are Office Depo  68% of revenue; Sam's Wholesale  17-18% of revenue; and Sam's International  2% of revenue. Costs have escalated at a time when the company has been unable to gain price increases for its products. Revenues have increased from 18.2 million dollars in 1993 to 23 million dollars in 1997. Growth will likely slow because of the loss of one significant customer.
Sensidyne manufactures gas detection and air sampling equipment including transmitters, sensors, and a pump used by industrial hygienists. Sensors are an important part of the gas detection business, and they are readily available in many markets. Recently, revenues have increased, but management believes it has hit a plateau because of market saturation. The company also distributes gas detection tubes that are made in Japan. Until recently, Sensidyne had exclusive distribution rights for the Japanese products. In 1997, the company distributed 40% of the Japanese products that accounted for 70-80% of its products. There is no long-term distribution agreement in place. The agreement made in August, 1996, was terminated. Sensidyne's toxic gas detection systems, produced and distributed by 94 employees, monitor areas for protection of workers and the public, mostly in the health and safety industry. These devices it produces may be reproduced by most competent electrical engineers. There are no patents protecting any of the products. Carl Mazzaca, president of this division, expects sales for that division to improve at the rate of 1 to 1½% over the next two years. He believes Sensidyne was purchased at peak performance and that its future sales are likely to decline.
Acro Molded Products, Inc., manufacturers cellular phones and other communication products including wire harnesses that connect electrical systems of mirrors which the automotive division manufacturers for cars. It also does business in the medical industry. Its sales have decreased about 10% since 1997. Motorola, its biggest customer, is decreasing its market share. Revenues increased from 14 million dollars in 1993 to 19.5 million dollars in 1997, with a spike of 22.1 million dollars in 1996. Pre-tax income in 1997 of 1.9 million dollars is highest for the period from 1993 - 1997.
Advantek was purchased at a time when its business was increasing. Its primary product is embossed carrier tape. It produces custom packaging products for original equipment manufacturers. Basically, the product is a mylar strip that it stamped to create a compartment for integrated circuits or for other products placed in the compartments. A cover tape is heat activated and placed on top of the carrier tape to hold the product in the compartment. Advantek distributes the product and does not manufacture it. The reels that control the tape are manufactured by Advantek. It also distributes integrated circuit test handlers and silicon wafer protection equipment. Facilities have been expanded in four other states and in Japan, Taiwan, Singapore, and Germany. In 1992, Advantek had the exclusive right to purchase material manufactured by a Japanese company. Since 1992, other manufacturers have developed competitive processes. Now, a German company has acquired a manufacturing advantage *882 in this area. Additionally, an Arizona company and a Wisconsin company produce similar embossed products. Economic risks facing Advantek after July, 1997, are anticipated reductions in growth. After the Asian crisis, currency was devalued in many of those countries making U.S. products more expensive and allowing manufacturing firms in the Far East to gain an economic advantage, including 3M, which operates there. Until recently, Advantek has been primarily involved in producing wider tapes, while 3M has manufactured narrower tapes. Advantek employs approximately 700 persons.
Management at Advantek is in turmoil at the present time because of the retirement of the company's founder, Jim May. Management views its prior market strengths to be weakening as other companies, including 3M, dilute its market share. There has been a 17 - 18% total operating income decrease at Advantek. The competitive environment in which Advantek operates is described by Halvor V. Anderson, Chief Executive Officer of the Company, as "brutal." Several other people have also vacated management positions at Advantek. Management has forecasted lower gross margins of 3% in the future. There have been severe price erosions reflected since 1988. Prices have been continually decreasing in this "surface-mount niche." Competition is now a significant factor in the company's future profitability. Among its major customers are Motorola, Phillips, and National Semi-conductor. It is anticipated that these companies will continue to become less significant purchasers in the future, and with increased competition, it becomes more difficult to align replacement customers. In the past, the unique manufacturing process, which served as a major advantage for Advantek, is being consistently diminished. No plant or office expansion is planned at the present time. Earlier, management anticipated that a 200,000 square foot facility would be built, but when the business did not materialize, the plan was discontinued. Contrary to the bleak business forecast for this division by Defendant's evidence, revenues have increased from 32 million dollars in 1993 to 98.6 million dollars in 1997.
Dolch Computer Systems, Inc., manufactures very rugged, smaller computers used on-site in manufacturing companies designed to tolerate direct sunlight and the customary trauma of an industrial work site. The portable computers have expansion slots and bays to accommodate many applications. Approximately 160 people produce the Dolch products for the manufacturing sector, military application, medical use, and financial customers. They are used in factories to interface with large factory automation systems. The company paid $42.6 million for Dolch Computer Systems, Inc., which represented the enterprise or control value of Dolch. Defendant projects continued sales decline for Dolch. Dolch has accounted for 12% of the operating income for the Company as a whole. A sales decrease is attributable to availability of competitive products and loss of its primary customer. The division has been very profitable, showing revenues increasing from 17.3 million dollars in 1994 to 57.8 million dollars in 1997.
Continental Disc Corporation, with headquarters in Liberty, Missouri, manufactures custom rupture discs and over-pressure and vacuum relief equipment for protection of workers and equipment from dangerous pressurization environments. The largest users of these products are companies involved in the safety industry with large customers from the oil fields and the brewery industry. Costs are increasing in a competitive environment where it is difficult to gain price increases. It is not the largest company in the business. Growth in the chemical industry has been restrained; activity in the oil patch has not been robust for some time; and demand in the brewing industry has been "flat." There are many new products in this industry being manufactured outside the United States by other companies. Most of the Continental Disc Corporation's 200 employees are located in Missouri. *883 Revenues increased from 19.6 million dollars in 1993 to 25.4 million dollars in 1997. Pre-tax profits have been impressive.
The Siegel-Robert Automotive and Appliance Division had net sales of $318,264,000 in 1997. It is primarily involved in manufacturing grille products and exterior mirror products and other trim products including name plates for the automotive industry. It is the world's largest custom plater, molder and finisher of plastics. The largest segment of growth has been attributed to the pick-up truck and sports utility vehicle ("SUV") lines in the automobile industry. At one time Siegel-Robert Automotive and Appliance Division had virtually all the pick-up, van and SUV business of Ford. Management knew in 1995 that it was losing business to Ford because contracts are awarded in the industry 3 - 5 years in advance of production. Generally, vehicles industry-wide have become more aerodynamic and include fewer injection molded products manufactured by Siegel-Robert. The major automobile producers have designed products that can be more readily supplied by many companies on a global basis. The Company believed in July of 1997, based upon projected contracts, that revenues would be flat during the next twelve months and that revenues would decline by approximately $30 million dollars. From 1988 - 1991, revenues declined 20% for this division. In 1993, the Siegel-Robert Automotive and Appliance Division accounted for 74.8% of total revenues. Since the Company made extensive plans to acquire new companies, it has become less reliant upon the highly competitive automotive industry. The Automotive and Appliance Division has gradually became less dominant in the Company's structure. This division also produces name plates for automotive companies. 3M has developed the "dimensional graphics" process which is being widely adopted in the industry. Its products are less expensive to produce. Name plate production has accounted for 12 - 15% of the revenues of Siegel-Robert Automotive and Appliance Division in the past. The demand trend since 1997 for this division's products has been unfavorable. Mr. Anderson admitted that while the division lost Ford business in 1992, and the outlook was bleak, yet in 1993, 1994, 1995, 1996, and 1997, the division grew and was profitable.
While the Company has experienced phenomenal growths since its beginning, the Court does not believe that this trend is likely to continue. If Defendant's witnesses' testimony is accepted literally, this Company is headed for certain collapse. While this apocalyptic view is exaggerated in the Court's view, the evidence in the case suggests that the very impressive growth the Company has experienced in the last five years is unlikely to continue. Many of the divisions operate in an internationally competitive environment with constant pressure to reduce prices to hold market share. No patent rights exist to assure resistance from competition. Some of the divisions were acquired when they were operating near maximum levels of profitability. It is unreasonable to believe that the Company can expect to grow at the same rate it has in the past, without a continued aggressive acquisition policy. Since that proposition lies in the realm of speculation at this time, the Court can only consider that the Company has been successful in the part in its diversification/acquisition efforts and that there is no stated policy suggesting it will not continue that practice; however, no quantitative values can be assigned to this consideration. In its successful attempt to diversify, the Company moved into the technology field at a time when its acquisitions held competitive advantages which have consistently been lost in the competitive global marketplace. None of the divisions maintain significant protected proprietary advantages. The Court concludes that Plaintiffs' expert has failed to adequately account for these considerations in his growth projections.
Mr. Anderson has been Chief Executive Operating Officer of the Company since October, 1996. He was a non-family member *884 shareholder who accepted the $20 amount for his shares when non-family members were squeezed out. He has been associated with the Company since August, 1981. In November, 1981, he was named vice president and treasurer. In 1995, he became executive vice president and treasurer. He continued his ascension in the Company as administrative assistant to the Chairman and CEO, Bruce Robert. Mr. Anderson's salary and bonus for 1995 was $1,419,169.00; for 1996, $1,398,618.00; and for 1997, $1,480,306.00. Mr. Anderson is a very aggressive CEO in his day-to-day approach to management of all divisions. While there has been testimony that the individual divisions are "stand-alone" companies; obviously, Mr. Anderson is the management head of all divisions whose presidents report directly to him. He visits locations regularly. He reviews weekly and monthly financial information submitted by the divisions, each of which maintains separate books. He acknowledges that he maintains current financial information on all divisions. Financial information was available to him in July, 1997, for all divisions. Divisions submit annual budgets, incorporating weekly and monthly forecasts, a couple of months in advance of the expiration of the fiscal year. He receives that information immediately. The Company provides centralized management systems to all divisions through in-house corporate counsel and a human resources department. The central office also provides input into operational issues of each division and has general management oversight of all divisions. Mr. Anderson deals with all phases for planning of the divisions and of the Company as a whole. The central office has an internal audit staff which reviews financial data of the divisions, assuring all adhere to acceptable business practices. He wants to assure effective internal control systems at all levels.
In 1981, Mr. Anderson was the sole person in the acquisition department. He made financial analyses of potential acquisition candidates, considering earnings, and applied multiples, including net after-tax income, earnings before interest, taxes, and depreciation. Earnings are one of the best ways, according to him, to determine whether a decent rate of return on investment is likely. Generally, an earnings multiple of 8 times after-tax earnings would meet his criteria and 4 times the EBITDA[5] would be an acceptable range for risk assumption. Additionally, he looked at book value and considered dividends of the target company. If the stock is not readily tradeable on a market basis, it becomes necessary, according to Mr. Anderson, to look at intrinsic criteria.
Mr. Anderson was asked to determine the value of the shares that would be paid to minority shareholders by the Company as of the merger date. He calculated a $20 share price. He did not consult the Board of Directors, any appraiser, any evaluation professional, any accountant, any member of senior management, or the president of Siegel-Robert Automotive and Appliance Division. He consulted no family or non-family members, nor did he consider appointing a committee to determine a fair value. He did not consider whether there was a duty to protect the interest of minority shareholders. He consulted with no one as to whether the $20 price was fair. The only thing Mr. Anderson referenced in letters to the shareholders concerning valuation consideration was a "fair market value" appraisal that he claims to have performed. None of the intrinsic analysis that he claims he did was provided to the shareholders. He mentioned that a prior arm's-length transaction had been concluded, and he enclosed a copy of the Missouri statute which provides for minority shareholders to receive fair value for their shares. He made no distinction between fair value and fair market value. He acknowledges a fiduciary duty to pay shareholders a fair value. He believed, in July, 1997, that fair value and fair market value represented the *885 same thing in giving a standard of value. Mr. Anderson understands that Mr. Patton, Defendant's expert, says that the fair value is either $30 or $46.20 and acknowledges that there is a "range." Mr. Anderson recommended the merger two days before the Board of Directors' meeting which was held on July 21, 1997, the same date the notice of vote to the shareholders on the merger proposal was mailed. The Board held a meeting to determine whether to recommend the merger to the shareholders. The meeting of the shareholders followed and the merger proposal was approved.
The assigned reason by Mr. Anderson for expeditiously scheduling the Board of Directors' meeting and consequently the calling of the shareholders' meeting was to consider making a Subchapter S election for Internal Revenue Service purposes to avoid direct income tax payments by the Company. In 1997, actual corporate taxes were $41 million. In 1998, taxes are projected to be five million dollars. This difference is the decision to adopt the Subchapter S corporate status. Under that arrangement, income is allocated directly to the shareholders, who then pay the tax rather than paying tax at the corporate level. The Subchapter S election was made prior to the July, 1997 time period. It was anticipated that there would be a downturn in the business cycle, and the Subchapter S election was made in anticipation of the less favorable business environment. It was apparent, because of the Company's fiscal period, that the election had to be made prior to August 1, 1997. Mr. Anderson recommended to the Board of Directors that the best interest of the Company would be served by making the Subchapter S election, and they accepted the recommendation.
Mr. Anderson realizes that the law allows up to 75 shareholders in a Company for Subchapter S status to be achieved and maintained. At the time of the Board Meeting, there were 63 shareholders, 40 of which were Robert family members and 23 of which were non-family members. Mr. Anderson recognizes that it would have been possible to get Subchapter S status without squeezing out the minority shareholders. He acknowledges that the minority shareholders who were squeezed out will receive none of the benefits of the Subchapter S election. Mr. Anderson explained to the Board of Directors the scope of the net savings to the Company by making the Subchapter S election, which savings could be distributed to the shareholders. He understood that it would be possible to get the Subchapter S status with up to 75 shareholders, but it was his concern, with non-family members in the Company, that the Company would be at risk of re-opening the tax issue, because 100% of shareholders had to agree to the election. Mr. Anderson wanted to be assured that the election could be made and preserved into the future without being repealed. The merger action, according to Mr. Anderson, was taken to reduce this risk and put control in the family that owned 93% of the shares before the merger. He asked no minority shareholders if they would agree to the Subchapter S election. He acknowledges that it would be possible to amend the bylaws to provide that no person could transfer their shares in violation of the Subchapter S election. Mr. Anderson assigns no other reason for eliminating non-family members, other than to obtain the Subchapter S status in a timely fashion and to protect it in the future from intentional or non-intentional acts that would jeopardize that status.
Mr. Anderson recommended to the Board of Directors that the Company convert to a Subchapter S corporation and that minority shareholders be cashed out at $20 per share. He has, as CEO, frequent contact with all people in the Company. Of the 23 non-family members, 15 of those shareholders voted against the merger and five abstained or were not present. Only 3 of the 23 shareholders voted in favor of the merger, one of whom was Mr. Anderson. The other two held small blocks of stock and were employed by the Company. Mr. Brockland was a minority shareholder on July 31, 1997, who *886 objected to the merger. He asked Mr. Anderson to reconsider the $20 share price, but Mr. Anderson demurred. Mr. Brockland suggested that Mr. Anderson hire an appraiser. Mr. Anderson did not accept that advice. Mr. Anderson stated that there was no market for the stock and that the shares had traditionally been sold at 65% of book value level, the price he paid when he purchased his 28 shares in the Company. That was the practice from November, 1981, and at all times thereafter, according to Mr. Anderson.
Before the merger in 1997, Ms. Morris had some discussion with Mr. Anderson over valuation of the Schneider estate shares. Mr. Anderson said that $18 per share is as much as could be offered at that time. Ms. Morris asked if the Company could pay more than $18 per share and if it would be possible to sell part of the shares rather than selling all at the same time. Mr. Anderson said that a partial sale was not permitted and that it would have to be an all or nothing deal. Ms. Morris believed that the share were worth more than $18 at the time and did not agree to sell. Mr. Anderson advised her to hold onto the shares because there would be a restructuring and that she would be hearing more soon. Ms. Morris was willing to sell 200,000 share at $18 per share. Thomas A. Swope, age 57, was employed by the Company in 1962. He was Executive Vice-President and was on the Board of Directors from 1990-1996. Mr. Swope knew, in 1995, that the Board was authorized to buy stock for $16.25 per share, and he thought that was a fair price at the time.
The Board of Directors accepted Mr. Anderson's recommendation, called a shareholder's meeting, and directed that the proper notices be sent. Letters advised shareholders that non-family shareholders would be cashed out. Mr. Anderson reported that before the merger, the corporation had recently concluded a transaction by purchasing some shares for $19.70 per share. Intrinsic factors Mr. Anderson said he considered in arriving at a $20 valuation were book value of the shares, earnings per year, the dividend history, and the rate projected to pay those dividends. He knew that the book value was in the neighborhood of $34 or $35 per share. Since the shares to be purchased were minority shares in a family-held corporation, he applied a discount. He calculated a 45% discount which would result in an evaluation of approximately $19 per share. Before he made the computation, he deducted $79 million for "intangibles," leaving $400 million in shareholder equity. He believed that the Company's practice had been to pay 65% of the value of shares in purchasing offered shares. (There is inadequate explanation for the additional 10% discount.) No intangibles were deducted under that practice. Therefore, by using the $400 million figure for shareholder equity, and multiplying by 45%, the analysis comes in as slightly less than $19 per share. He claims to have considered after-tax net income of $67 million and to have applied an EBIDTA analysis. He claims to have aimed at a range of value of $450 - 530 million for the Company. By dividing $450 - 530 million by the number of outstanding shares, the result is $34 - 38 per share. He also claims to have considered a lower income projection for the following year, which he projected at $60 million in after-tax net income, and to have arrived at a value for the Company of $420 - 480 million or a share value of $32 - 36. Mr. Anderson also says that he considered some multiples applied to the Dolch acquisition which were a little lower. The third intrinsic factor he considered was historical dividend figures. Dividends for the following year were projected at $.82 a share. He capitalized dividends at 5%, a very low liquid saving rate, and arrived at a value of $14.40 a share. Under that calculation, he applied no minority interest discount. Mr. Anderson believed that his valuation was reasonable and that the conclusion that $20 per share was fair value for the shares was reasonable. The Court is not convinced that he conducted the in-depth *887 financial analysis outlined. The Court is further persuaded that while an evaluation of $20.00 per share may have been warmly embraced by majority shareholders in this squeeze-out process, it is reasonable to call into question Mr. Anderson's credibility, based upon all of the evidence in this case, because he claims to remain convinced that his $20.00 per share valuation is reasonable.

II. Experts' Valuations of the Company
The Court will now make a determination of fair value for the minority shareholders' shares as of July 30, 1997, the day before the merger. During the course of the hearing, each party attempted to substantiate their respective conclusions or to vilify opposing appraisers, based upon conclusions reached in other reported cases. The Court neither adopts nor rejects all of the conclusions of any expert who testified herein. Some testimony was helpful, while some was detracting to the Court's ultimate responsibility in arriving at fair value for the subject shares. The conclusions reached herein rely upon reasonable testamentary statements and all evidence which, in the Court's judgment, logically and reasonably supports the evaluation process and final fair value calculation.
The parties agree that there are three levels of value: (1) the highest value is control value or enterprise value; (2) the next lower value is the marketable minority interest value; (3) and the lowest level of value is non-marketable minority interest value. A business entity may be valued by many methods, but generally these are expressed in three approaches called the (1) asset-based approach; (2) the market approach; and (3) the income approach. Businesses may have (1) value as a going business or a continuous concern; (2) value in place but not in use  business assets are aggregated, but not calculated as an operating company; (3) value in exchange for an orderly disposition  piecemeal sale in a secondary market; and (4) value in exchange in a forced liquidation  assets are sold at less than minimum value.
The asset-based approach is an indirect method whereby the business units are appraised, accumulated and reduced by all liabilities, resulting in a value for the owners' equity in the business entity. The market approach commonly recognizes the (1) guideline merged and acquired company method  compares the company being investigated with companies bought or sold in an acceptable time frame and the (2) guideline publicly traded company method  companies publicly traded on recognized exchanges are selected and compared to the company being valued. The income approach attempts to value a business entity at a given time based on present value of future economic income estimated to be realized by owners of the company. Two common methods of this approach are (1) yield capitalization method  calculation of present value of projected economic income and (2) direct capitalization method  capitalization of a period estimate of economic income by a direct capitalization rate. A common yield capitalization method is the discounted cash flow method.
In determining a value for the enterprise or control value, it is common to look at merger and acquisition values. The second most common method in arriving at a value for the enterprise or control value is to conduct an income-approach analysis according to yield capitalization or direct capitalization methods. The third approach is by indirect methods starting with the minority interest valuation and adding a control premium.
Plaintiffs' expert, Robert Reilly, made a control or enterprise valuation for the fair value of equity of the Company of $98.40 per share and determined the second level of value, or marketable minority interest value to be $72.90 per share for the fair value of equity of the Company. He determined the third level, the non-marketable minority interest value to be $72.90, the same value he placed on the marketable minority interest value. He works in the transactional section of Williamette *888 Company, structuring and facilitating transactions. He was formerly with a general management consulting firm before affiliating with the Deloit & Touche Accounting Firm as a partner, where he was national director of valuation services. He terminated that employment and joined the Williamette Company in 1991. He is a member of the American Society of Appraisers and is on the examination committee of the organization. He has been Certified Public Accountant since 1977. He lectures on the subject of Business Evaluations and is a Certified Real Estate Appraiser. Mr. Reilly has had experience in evaluating many kinds of companies. He first became aware of the engagement to provide professional services in this case in late December 1997. He was asked to estimate the fair value of the stock of the Company as of July 30, 1997. He believed that the primary source of the standard of value is the Missouri statutes. According to Mr. Reilly, standard of value is a term of art with a specific meaning that is "definition of value." There are many standards of value. The most common is fair market value, which is the price a willing buyer would pay and a willing seller would receive. Another example of standard of value would be investment value  "what is the business worth." Another example is collateral value  "value to the bank." Mr. Reilly arrived at fair value as the value of the "stock" before the merger transaction that gave rise to the court proceeding. Mr. Reilly derived his definition from the Missouri statutes, the Missouri Bar Association Law Journal, cited court cases, and the general work in the area of considering fair value.
It is common to consider fair market value first because it has the most protracted definition. In the fair market value analysis, it is assumed that both parties are informed, are able to protect their respective self-interests, and are meaningfully negotiating. That analysis involves voluntary entry into the market place where neither party is under duress. If the price is not attractive, there is no compulsion to enter into bargaining. In such an environment, both parties seek to maximize their self-interests. Fair value involves an entirely different analysis, because of the absence of a market. There is no implication that both parties have entered the market place, or that all of the parties are equally well-informed of the circumstances involved in the transaction. Additionally, one of the parties lacks the ability to back out or withdraw from the transaction, and one of the parties cannot negotiate the best price.
Mr. Reilly suggests that an appraisal of a business entity is preceded by establishment of an appropriate premise of value derived either as (1) value in exchange, on an asset-by-asset basis, or (2) value in use, as part of a going-concern enterprise. Here, the premise of value on a going-concern enterprise basis represents, in his judgment, the highest and best use of the Company.
Mr. Reilly concluded that the level of value for the shares of the non-family members should be calculated according to the enterprise or control level of value because the Missouri statutes and literature relating to this evaluation suggests that this is the appropriate analysis. A purchaser of a company, under this analysis, would receive facilities, employees, and, among other things, future income. This approach attempts to determine what investors would pay for a business. It is Mr. Reilly's view that any other approach, where a controlling shareholder would cash out minority shareholders, would result in the majority shareholders becoming unjustly enriched and minority shareholders becoming unjustly deprived. Additionally, he points out, other economic considerations are relevant, because after minority shareholders are cashed out, they are deprived of economic benefits; e.g., majority shareholders could take the company public or merge the company. Additionally, Mr. Reilly believes that a marketability discount should not appropriately be considered because the transaction that creates the court proceeding *889 creates a market. After the merger the controlling shareholders have created an internal market because there are new shares or cash, but in any event, shares will change hands. A squeeze-out of the minority shareholders is a compulsory transaction insofar as minority shareholders are concerned. The minority shareholders do not want to sell but are required to do so.
In determining that the enterprise or control level evaluation was appropriate, Mr. Reilly concluded that after the merger, the majority shareholders gained additional control. Control has a value associated with it, and ownership of 100% of the shares by its nature provides a greater power structure than owning proportionately less than the total. Minority shareholders typically suffer from lack of control and lack of marketability. Before the cash-out merger, minority shareholders, with other shareholders, had the right to appoint management, to set policy, to sell or buy assets, to select vendors, to liquidate, to dissolve, to acquire new companies, to buy or sell treasury stock, to change bylaws, or to pay dividends. They could hold their shares absent a squeeze-out, receive dividends, participate in company-wide benefits, and participate in any activity to increase the value of the company.
Since the evaluation date was July 30, 1997, one day before the merger, Mr. Reilly concluded that it is not appropriate to consider actual results of the Company after the evaluation date, because as of the date of valuation, one day before the merger, those facts would not have been known, nor should they have been considered. All of the data he considered was generated before the evaluation date, as well, except management's projections for the future.
Mr. Reilly concluded that the Company is fairly well diversified as a holding company involved in several lines of business. At the time of the merger, the Company had assets of 532 million dollars, annual receipts of 553 million dollars, and a cash position of 202 million dollars which translates into slightly more than $15 per share of value. The cash value of the Company alone translates into three-fourths of the value Mr. Anderson assigned for the total value of the minority shares. Mr. Reilly observed that the Company's cash reserves of $202 million is a high percentage of total assets (31.8%) which he believes to be a very positive factor that gives the Company more options for reducing risk.
Mr. Reilly reviewed the Siegel-Robert's Board of Director's minutes and the 1993 - 1997 financial statements. Pre-tax income for the Automotive and Appliance Division was $47,582,000 in 1993, and $64,900,000 in 1997. Adjusted pre-tax income for the other subsidiaries combined was $16,649,000 in 1993 and $46,823,000 in 1997. The trend, according to charts introduced in evidence, suggests that adjusted pre-tax income for the combined subsidiaries has gradually increased from 1993 through 1997. Adjusted pretax income for the automotive and appliance division has been maintained at a flatter rate. For 1994, adjusted pre-tax income was $53,792,000; for 1995, $52,669,000; for 1996, $51,033,000; and spiked to $64,900,000 in 1997, which was an exceptional year for the automotive industry. This trend further demonstrates that the Siegel-Robert Automotive and Appliance division has performed exceptionally well in the described highly competitive internationally compressed market. It further suggests that Defendant's predictions of poor performance for this division in the future are exaggerated. This division, since its organization, has been able to develop new products and acquire new customers. Its existence and growth is a demonstration of enhanced productivity in American business.
Mr. Reilly's next observation is that the Company has not been deterred in paying dividends and making charitable contributions over the years. The Company maintained its charitable contribution giving level at $8,000,200 per year for 1996, 1997, and 1998. That suggests to him that the *890 Company is generating a lot of cash and is indicative of management's positive analysis for the future. Mr. Reilly's next observation is that there is insignificant long-term debt on the Company's balance sheet. Total debt of less than $400,000 suggests no risk for investors or purchasers and a very high capacity for the Company to raise funds. Shareholder equity has increased because of internal controls making the Company less at risk in 1997 than it was in 1993. The Court believes that these observations seem well founded.
Mr. Reilly's next observation is that the book value of $455,000,000 translates into a per share value of $33.82 per share. This figure applies equally to majority and minority share interests. In a profitable business, he believes book value is a floor or minimum value per share, indicative of a valuation for liquidation but not for valuing an operating company. When compared to the $20 per share price offered to minority interest shareholders, it is clear in the Court's view that the book value calculation demonstrates that the $20 amount is unreasonable. The book value analysis does not consider the Company as a going concern, and no one suggests this Company is ready to cease operations.
Mr. Reilly notes that the Company has a strong management team in place with long-tenured senior executives with ample experience. The Company has maintained its ability to retain senior managers that use their skills to acquire profitable companies. He concludes that the Company's managers are very knowledgeable. Particularly, he notes that Mr. Anderson, CEO, is very competent.
As noted, Mr. Reilly explained that there are various approaches to valuing companies. The market approach applies given multiples to the subject company to get indications of value. The income approach estimates a measure of future income that the company would expect to receive. Mr. Reilly looked at the treasury share transactions and concluded that the price paid did not represent fair value transactions. Generally, he believes that the few transactions where the shares were purchased by the Company occurred after the Company suggested a price to shareholders who wanted to sell, and no negotiation process was involved. The price was set by the Company as a "take it or leave it" proposition.
Mr. Reilly used three separate methodologies to value the Company: (1) the income approach method; (2) the direct capitalization method; and (3) the guideline publicly traded company method. First, he valued each of the six units separately, then aggregated the values. He described his approach as using two approaches, the market approach and the income approach. With the market approach, he used the guideline publicly traded company method, and with the income approach, he used the direct capitalization method and the discount cash flow method. Guideline publicly traded company data is available from many sources including the Securities and Exchange Commission, Standard and Poor's Stock Guide, CompuServe, Tradeline and Moody's financial resources. Use of the guideline publicly traded company method is designed to estimate a value for a company that is not publicly traded, as if it were so traded, and for that analysis, the company is compared to companies that are publicly traded. This method is used when very similar companies have not been bought or sold so that a more direct comparison can be made. The Court observes that the conclusions of any analysis by use of this method are only as reliable as the selection of the guideline companies used.
Consideration of different approaches permits an examination of the Company from different perspectives. The income approach is considered to be an "internal approach." The market approach looks at value of a company from the passive investor's perspective. The guideline publicly traded method values all six units separately, then aggregates their values. Method number two, the direct capitalization method, is an income approach for all *891 six businesses. The yield capitalization or an income approach is performed on a consolidated aggregated basis.
At the mid-level of value or the marketable minority interest value, using the guideline publicly traded company method. Mr. Reilly concluded that the Company was valued at $1,008,100,000. For the mid-level value using the direct capitalization method, he concluded that the Company was valued at $849,000,000.00. For the mid-level value calculated under the discounted cash flow method. Mr. Reilly concluded that the value of the Company was $1,088,000,000.00. It is his belief that a stronger analysis can be made on a company by company basis because of data considerations. He found difficulty finding comparable public trading companies as a source of comparison on a consolidated basis. Here, 50% of value is represented by the Siegel-Robert's Automotive and Appliance Division and 50% by the other companies. There is a mix of high tech companies, and he could not find guideline companies that would compare on a consolidated basis; therefore, he concluded that he could not do an effective evaluation under the guideline publicly traded method on a consolidated basis.

A. Advantek
Mr. Reilly first evaluated Advantek. Inc., concluding that it was a "stand alone" company, with its own management, employees, customers, suppliers, audited financial statements, and facilities. The Court concludes that none of the divisions are actually stand alone companies. All are centrally managed under a chief operating officer and are provided in house administrative, legal and financial services. None of the divisions operate totally independently of the Company.
Under the guideline public traded method, Mr. Reilly searched for publicly traded companies that are good comparables or companies engaged in the same business as Advantek. Since he was unable to locate good comparable companies to his satisfaction, he relied upon six guideline companies which compared relative risk and levels of expected return. He next adjusted pricing multiples by comparing financial statements for the five-year period before the evaluation date. He next selected six valuation pricing multiples: (1) price to earnings ratio (P/E); (2) earnings before interest and taxes (EBIT); (3) earnings before depreciation interest and taxes (EBDIT); (4) price to debt-free net income (DFNI); (5) price to debt-free cash flow (DFCF); and (6) price to revenues, sometimes called price to sales (P/R). After these pricing multiples are calculated for each guideline company, the mean and median of each multiple is calculated for each company. A subject specific pricing multiple taken from the sample pricing multiple is then applied to the appropriate financial data of the company being evaluated. By multiplying these pricing multiples by the financial data of the company being evaluated, a preliminary estimate of value of that company is calculated. The resulting value should estimate what informed national capital market investors would pay to own stock in the company being valued. Guideline companies are those publicly traded over organized capital market exchanges. This method's measure of reliability is determined by selecting appropriate guideline companies based upon reasonable comparability and industry criteria. The preliminary estimate may be adjusted for lack of comparability between the company being valued and the guideline companies. Fair value analysis of the respective divisions made by Mr. Reilly is the mid-level of value or the marketable minority interest valuation.
He adjusted prices, earnings, cash flow, and book value of the guideline companies to an invested capital basis to mitigate the differences in the financial leverage among the guideline companies. His objective is to compute market-derived pricing multiples consisting of the market value of a company's total invested capital (MVIC) or market value of equity plus long-term interest bearing debt in relation to its earnings, cash flow, and book value. Interest expense is added to earnings and cash flow *892 so the invested capital adjustments mitigate distortions in pricing multiples that result from different capital structures. Cash flow is defined for Reilly's calculations as pre-tax income plus depreciations and amortization. Cash flow is adjusted to an invested capital basis by adding back interest expense resulting in earnings before depreciation, interest, and taxes (EBDIT). This removes differences in financial leverage and alternative depreciation methods.
The guideline publicly traded company method estimates a value for a hypothetically publicly traded equivalent value company. The pricing methods above mentioned are applied to the financial performance of the company to be valued based on its historical growth, risk, and profitability in relation to the guideline companies with adjustments for quantitative factors unique to the company to be valued. After calculating the six multiples for the six guideline companies, Mr. Reilly then arrayed them in a fashion to look at high, low, and median multiples. The low earnings multiple was 17.3 and the high was 20.1. The median was 19.1.
He regards the next step as critical, because it requires making a judgment as to which multiple to select in a range from 17.3 to 20.1 to arrive at a valuation for Advantek. Advantek's financial performance figure he used for the twelve months last reviewed was $13,916,000. He selected the earnings multiple of 17.5 which is just higher than the lowest for all of the guideline companies. He noted that Advantek was more profitable than any of the guideline companies. He observed that Advantek fell below the guideline companies' growth rates, so he selected an earnings multiple at or near the bottom of the range. When applying the earnings multiple of 17.5 to the latest reviewed twelve month performance of $13,916,000, the indicated market value of invested capital (MVIC) is $243,523,000. The five year average of earnings is $9,828,000 and the MVIC is $250,617,000 when applying a multiple of 25.5. The average MVIC for the "earnings" multiple for the latest twelve months and for the five-year average is $247,070,000. Mr. Reilly conducted a similar analysis for the EBIT, the EBDIT, the DFNI, the DFCF, and "revenues" comparing latest twelve-month figures with a five-year average.
For his EBIT calculation, Mr. Reilly selected multiples for the latest twelve months available at the time of analysis. He considered a low of 8.9, a high of 12.2, and a median of 10.0, when comparing the guideline companies. He selected the median noting that Advantek, when compared to the guideline companies, revealed a low growth rate for Advantek. He therefore selected a multiple of 10 times the EBIT of $21,098,000 for the latest twelve months and arrived at a MVIC of $210,980,000. For the five-year average, the MVIC under the EBIT analysis is $217,652,000 using a multiple of 14.5 on performance of $15,010,000. The average MVIC under the EBIT calculations for the latest twelve months and for the last five years is $214,316,100.
For his EBDIT calculation, he selected the median multiple of 9 from the guideline companies multiplying that times the performance for the last 12 months of $27,228,000 arriving at a MVIC of $245,052,000. For the five-year average, the performance figure was $19,355,000 and the multiple he selected was 11.5. The MVIC for the five-year average is $222,582,000. The average MVIC under the EBDIT is $233,817,000.
For the DFNI multiple, he selected 16.5, the mid-point figure which is just below the median for the guideline companies which was 16.7. The performance for the latest twelve months is $13,992,000, so the MVIC is $229,706,000. For the five-year average, the MVIC is $231,125,000. The performance figure was $9,835,000 and the multiple selected for the five-year average was 23.5. The average MVIC under the DFNI multiple calculation for the latest twelve months and for the last five years is $230,415,000.
*893 For his DFCF calculation, he selected a multiple of twelve. Advantek is slightly below the median in earnings for the last twelve months and about the same for the last five years. The MVIC for the last twelve months is $240,619,000 on earnings of $20,052,000. For the five-year average on earnings of $14,180,000 and a selected multiple of 16.5, the MVIC is $233,963,000. The average MVIC under the DFCF calculations for the latest twelve months and for the last five years is $237,291,000.
His last calculation on a price to revenue multiple was 1.8 for the last twelve months. 1.8 is higher than the median because Advantek outperforms most of the guideline companies. On a selected performance figure of $98,629,000 and a multiple of 1.8, the MVIC is $177,532,000. For the five-year average on earnings of $64,206,000 and a selected multiple of 2.90, the MVIC is $186,198,000. The average MVIC under the "revenues" multiple calculations for the latest twelve months and for the last five years is $181,865,000.
Considering a low MVIC of $181,865,000, for the "revenues" calculations and a high MVIC, based on the "earnings" calculation of $247,070,000, he took an average, getting the figure of $224,039,000 to arrive at an indicated market value of invested capital. When market value of interest bearing debt was subtracted, he concluded that the indicated market value of equity on a marketable minority ownership interest basis would be $221,667,000 under the guideline publicly traded company method. All but one of the multiples used by Mr. Reilly were at or below the median resulting, according to him, in a conservative valuation. In revenue performance, Advantek outperformed all of the guideline companies.
Next, Mr. Reilly valued Advantek based under the "direct capitalization method," which is used when current operations approximate expected future operations, assuming a normal growth rate. Current operations or next year's projected operations are divided by a capitalization rate to arrive at an estimation of value. The first step is to secure financial statements for a designated period of time then make adjustments to mitigate errors. Then, calculations are made to arrive at adjusted net earnings after adjustment for state and federal income taxes. If the "benefit stream" is cash flow, it will be capitalized and additional adjustments for taxes will be made to arrive at a gross or a net cash flow. Next, a capitalization rate is determined for the "benefit stream" to be capitalized. The period of operations to be capitalized may be the last twelve months or a period of time into the future, or an average of several preceding years. Finally, an operating value of a company is determined by dividing net earnings or gross or net cash flow by the capitalization rate.
In calculating a capitalization rate which is a by-product derivative of the present value discount rate, the formula is the present value discount rate less a long-term growth rate. The discount rate, referred to as the weighted average cost of capital (WACC) is a company's blended required rate of return on equity and a rate of return on debt capital.
The first of the two methods used by Mr. Reilly was the "build-up" method or what he called the "bottom up" approach to determine the cost of equity capital. Cost of equity capital was calculated by Mr. Reilly by averaging the "bottoms up" or build up approach that arrives at a rate using a risk free rate of return plus empirical evidence of equity rate of return data from financial services (Mr. Reilly used Ibbotson's 1997 SBBI) and replacement cost of debt capital. Empirical evidence from Ibbotson's includes a long-term equity risk premium representing incremental rates of return realized on large capitalization common stocks over the risk free rate historically reported from 1929 to 1996. Then, a small company equity risk premium is added representing additional expected incremental rates of return over the long-term equity risk premium realized by investors in those companies in the *894 bottom quintile of the New York Stock Exchange based upon size.
With that approach, it is necessary to assess the risks and income projection that will be capitalized. He adopted a risk free rate of return of 6.4%. He added a long-term equity risk premium of 7.5% and a small risk premium of 5%, arriving at a "build-up" approach yield capitalization rate / weighted average cost of capital (WACC) of 18.9%. He then averaged this rate with a rate calculated under the Capital Asset Pricing Model (CAPM).
This second approach is to use the CAPM which is expressed in a formula whereby the cost of equity capital is designated Ke. The formula to arrive at the cost of equity capital is Ke = Rf + B (Rm - Rf) + Rps. Rf is the risk free rate of return (U.S. Treasury Bond rate). Here, it is plugged in at 6.35%. B is the beta factor for public companies, used to determine the subject company's beta coefficient for the company's risk relative to public companies. The Court shall discuss the importance of the selection of the beta factor subsequently. (Rm - Rf) is the long-term market equity risk premium. Rps is the small equity risk premium. Applying the formula to Advantek. Mr. Reilly subjectively adopted 0.94 as a beta factor, concluding the Company was at a lower level of systematic risk than the overall market. He adopted the market equity risk premium (Rm - Rf) from the Ibbotson financial service company at 7.5%, the average historical spread between common stocks and the long-term government bonds. He then adopted a 3.5% small equity risk premium from Ibbotson's averaging the historical spread between small stock total returns and common stock total returns. The cost of equity capital "specific to this industry," according to Mr. Reilly, is calculated at: Ke = 6.35 + .94(7.5) + 3.5, rounded to 17.0%.
In calculating the return on equity (ROE) for Advantek, Mr. Reilly subjectively concluded that no additional risk premium should be added. He concluded the average cost of debt to be 8.5%, or the prime interest rate of July 30, 1997. That is the estimate of cost of debt for Siegel-Robert Automotive and Appliance Division because the subsidiaries do not incur debt independently. He looked at six companies which had equity to invested capital ratios of 80% to debt of 20% for comparison purposes. Next, he multiplied 17.9% (the average of the build-up cost of equity capital figure of 18.9% and the CAPM cost of equity capital figure or 17.0%) times 80% and added the calculation of 5.6% (after tax cost of debt capital) times 20% to arrive at a weighted average cost of capital (WACC) which equals 15.4% which he rounded up to 16%.
Next, he needed to determine a direct capitalization rate. For that he used the formula of K(discount rate) - G(growth rate) = D(direct capitalization rate). The 16% figure less the long-term growth rate of 7% equals the direct capitalization rate of 9%. He acknowledges that the 7% expected long-term growth rate involves an element of judgment. In 1995 - 1996, revenues increased 34% and in 1996 - 1997, they increased 23%. The projected figure for 1998 is 9.1%. He believes that the 7% rate is conservative when compared to the industry. His selected 7% rate, he notes, is less than the management's short-term growth rate. The Court believes his selected growth rate of 7% is too high, based upon all of the evidence in the case.
The next step is to arrive at a numerator which is a level of income to capitalize into the future, here the net cash flow of Advantek. He stated that judgment is not required for this calculation because the figure can be determined from Advantek's proposed budget. Projected net-cash flow divided by the capitalization rate equals an indication of value for Advantek. The projected net-cash flow figure used for the numerator was $11,196,000, obtained from financial documents of Advantek. This mathematical exercise results in a figure of $124,396,000. From that is subtracted *895 long-term interest bearing debt of $2,372,000 resulting in an evaluation of $122,024,000 which is the fair value of equity of Advantek in his judgment under this method. Accordingly, the marketable minority ownership interest value of Advantek by the direct capitalization method is $122,024,000, rounded to 122,000,000, according to Mr. Reilly's calculations.

B. Correl, Inc.
Correl, Inc., is valued by Mr. Reilly under the guideline publicly traded company method at $34,200,000. Correl had positive revenue and profit growth over the five-year period from 1993 - 1997. It is less leveraged than most of his selected guideline companies and its return on revenues is above all of the guideline companies. It is smaller than most of the guideline companies, its growth on earnings is lower than all of the guideline companies, and its growth in calculating the multiples of EBIT, DFNI, and cash flow is below the median level for the guideline companies.
Under the build-up approach, Mr. Reilly arrived at a cost of equity capital of 16.9%. That was calculated by using a risk-free rate of return of 6.4%; adding a long-term equity premium of 7.5%; adding a small stock equity risk premium of 5.0%; and subtracting a company specific equity risk premium of 2%.
Under the CAPM approach, a very low beta of .38 was adopted by Plaintiffs. It is undisputed that selection of the lower beta results in a higher value for the company being evaluated. It is the Court's view that selection of such a low beta by Mr. Reilly for this company results in a higher valuation for Correl, Inc. than the evidence supports. It is the Court's view that the evidence supports a beta calculation substantially higher than .38. The market equity risk premium was set by Mr. Reilly at 7.5%. The small stock equity risk premium from Ibbotson's is 3.5%. Cost of equity capital, or Ke = 6.38 + .38(7.5) + 3.5 or 10.7%. The ROE incorporated not only generic equity risk but also specific risks of the company's profitability. Because of Mr. Reilly's belief in limited risk in the furniture industry and Correl's record of financial data projections, an additional - 2% was factored. A 75%/25% equity to debt ratio is assumed in this analysis. Cost of debt capital was fixed at 8.5% (5.1% after tax) with a cost of equity capital of 13.8% (average of build-up method, 16.9% and CAPM method, 10.7%), and when weighted for debt/equity, the WACC is rounded at 12.0%. With a yield capitalization rate of 12% and estimated long-term growth rate of 5%, the direct capitalization rate is 7%. Net cash flow is $2,175,000, and when divided by 7% the value of equity under the direct capitalization method for Correl becomes $38,800,000.
L.D. Doughman is President of Correl, Inc. Because of loss of business from a primary customer, he expects income and revenue to decline in the future, as soon as next year. Sam's Wholesale, the key customer, in June or July, 1997, dropped a folding table in one half of their stores and he expects a loss of $2 million from that event alone. The Court is persuaded that Mr. Reilly's valuation of Correl is inflated.

C. Continental Disc Corporation
Next, Mr. Reilly valued Continental Disc Corporation by the guideline publicly traded company method, finding its value to be $50,600,000. The Court will not further add to the burden of this already lengthy opinion by restating the terminology previously included in the valuation of Advantek, but will, instead, cite only the ultimate conclusion of Plaintiffs' expert. Based upon the guideline publicly traded company method, Mr. Reilly observed that CDC had positive revenue and profit growth from 1993 - 1997; it was less leveraged than selected guideline companies; and the return on revenues is above the guideline companies selected. He observed, at the same time, that CDC is smaller than the guideline companies, and its growth in earnings and cash flows is lower than the median for the guideline companies.
The direct capitalization method analysis by Plaintiffs produced a value of $41,100,000. Under the "build-up" approach, the *896 risk-free rate of return selected is 6.4%; the long-term equity risk premium is 7.5%; and the small stock equity risk premium is 5.0% for a total cost of equity capital of 18.9%. Under the CAPM approach, Ke (cost of equity capital) = 6.35 + .38(7.5) + 3.5 or 12.8%. The beta of .38 is very low, an indication that Mr. Reilly believes CDC has a very low level of systematic risk and is less sensitive to market changes. The Court believes that this beta factor is not supported by the evidence and should be substantially higher. The capital to debt ratio adopted by Mr. Reilly is 85%/15%. The after tax cost of debt capital is 5.2%. He multiplied 15.8% (the average of the build-up cost of equity capital rate of 18.9% and the CAPM cost of equity capital rate of 12.8%) times 85% (13.88%), then added the figure produced by multiplying 5.2% times 15% (.78) arriving at a WACC rounded at 14%. Rounding down overstates the value of the company. The long-term growth rate is set subjectively at 5%. This appears from the evidence to be realistic. With a yield capitalization rate of 14% less an expected long-term growth rate of 5%, the direct capitalization for CDC calculated by Plaintiffs is 9%. Projected net cash flow is 3,695,000 and when divided by 9% produces a fair value of equity for CDC of 41,100,000.00.

D. Dolch Computer Systems, Inc.
Mr. Reilly next valued Dolch Computer Systems, Inc. under the guideline publicly traded company method at $133,600,000, based only upon the latest twelve months period because of unavailability of other financial information. Dolch is no larger than most of the guideline companies selected; it was similarly leveraged; the financial ratios related to profitability and liquidity were near or higher than the median guideline company; and return on revenues is above the median.
By using the direct capitalization method, Mr. Reilly determined the value of Dolch Computer Systems, Inc. to be $100,000,000. First, using the "build-up method" the risk-free rate of return selected is 6.4%, the long-term equity risk premium assigned is 7.5%, and the small stock equity risk premium is 5%, for a "build-up" approach cost of equity capital of 18.9%. Using the CAPM approach, a beta factor of 1.09 was subjectively chosen, comparing Dolch to similar publicly traded companies. The market equity risk premium of 7.5% was selected from Ibbotson's. A 3.5% small stock equity risk premium was also taken from Ibbotson's. The CAPM cost of equity capital under the formula is calculated as Ke = 6.35 + 1.09(7.5) + 3.5 or 18.1%. The "build-up" figure of 18.9 and the CAPM number of 18.1 are averaged for a total cost of equity capital of 18.5%. No specific risk is associated with Dolch according to Mr. Reilly, so no additional risk premium is assigned. The capital structure adopted by Mr. Reilly is 90% equity to 10% debt. A cost of debt capital of 8.5% (5.3% after tax) with equity/debt weighting produced an overall WACC of 17.0% for Dolch. A long-term growth rate of 7% is assumed by Mr. Reilly. The Court is persuaded that this projected growth rate for this division is too high by as much as 3%. With a yield capitalization rate of 17% less long-term growth rate of 7%, the direct capitalization rate is 10%. Projected net cash flow subject to direct capitalization is 9,998,000.00, and when divided by the 10% direct capitalization rate, the result is a value of invested capital of 99,980,000 which Mr. Reilly rounded up to $100,000,000. If the growth rate should be calculated as low as 3%, which is in the Court's judgment too low, the valuation becomes $76,907,692.30.

E. Sensidyne, Inc.
Mr. Reilly next valued Sensidyne, Inc. under the guideline publicly traded company method, which resulted in a value of $21,600,000. Sensidyne showed strong revenue and profit growth over the five-year period from 1993 - 1997. It is similarly leveraged as a median guideline company with strong correlation between growth and return on revenues. Sensidyne is smaller in size than the median guideline companies, and growth in earnings *897 and cash flows is near the median level of the guideline companies.
In making his direct capitalization valuation, Mr. Reilly selected a low beta of .51 representing Sensidyne at a low level of systematic risk and less sensitive to changes in the overall market in making his direct capitalization valuation. The Court is persuaded that selection of this beta factor is too low when measured by the evidence in the case, resulting in an inflated value of this division. The market equity risk premium taken from Ibbotson's is 7.5%. A 3.5% small equity risk of premium from Ibbotson's was selected. The CAPM cost of equity capital calculation is Ke = 6.35 + .51(7.5) + 3.5 or 13.675%, rounded up to 13.7%. The build-up cost of equity capital approach was calculated by using a risk-free rate of return of 6.4%, a long-term equity risk premium of 7.5%, and a small stock equity risk premium of 5%, for a total of 18.9%. The build-up approach figure of 18.9% and the CAPM figure of 13.7% are averaged at 16.3%. No additional risk premium or specific risk associated with Sensidyne is indicated. The median capital structure of 95% equity to 5% debt is determined to be acceptable for Sensidyne. Weighting the cost of debt capital at 4.8% (pre-tax) results in an overall WACC of 16%. A low growth rate of 3% is adopted. This growth rate is consistent with the evidence, in the Court's view. The yield capitalization rate is reduced by the long-term growth rate of 3% for a direct capitalization rate computation of 13%. Projected net cash flow is $2,035,000, and when divided by 13%, the result is a market value of invested capital of $15,651,000, rounded up to $15,700,000.

F. Siegel-Robert Automotive & Appliance Division
In valuing the Siegel-Robert Automotive and Appliance Division, Mr. Reilly included in that evaluation Acro Molded Products, Inc., a very small company with only $10,000,000 in annual sales. There are no separate financial records available for calculation purposes concerning Acro. In evaluating the Siegel-Robert Automotive and Appliance Division, he used the same processes, except he expanded the definition of MVIC for calculation purposes to include long-term debt for shareholder equity less cash. He believes that is necessary to adjust for the excess cash balance and chose this practice rather than treating cash as an excess asset. He used a debt-neutral method and a cash-neutral method. Otherwise, the company would appear to be more valuable than he believes a fair analysis should reveal. He used a 2% growth rate. A real growth rate is one calculated after making adjustment for inflation. He used a 3.5% inflation rate. It is likely, he believes, that relative to the Company overall, the Siegel-Robert Automotive and Appliance Division will continue to shrink. He based his conclusions upon assessment of management projections, assessment of risk factors, and all long-term information, which is more available than for the other divisions. He understands that this division is competitive and is in a low-margin industry. He recognizes, as a practical matter, that the division has done a good job in getting new business as it loses other business in this highly competitive industry. Mr. Reilly valued Siegel-Robert Automotive and Appliance Division under the guideline publicly traded company method at $546,400,000. The division has exhibited revenue and profit growth in each of the five years from 1993 - 1997. Return on revenues is above all of the guideline companies from the latest twelve months' financial information and for the five-year period from 1993 - 1997. The division is less leveraged than most guideline companies. There is a strong correlation between return and revenues in multiples. The division is smaller than most of the guideline companies selected, and growth in earnings and cash flow is below the median level for the guideline companies. Plaintiffs valued Siegel-Robert Automotive and Appliance Division using the direct capitalization method at $530,900,000. Under the build-up approach, the risk-free rate of return is 6.4%; long-term *898 equity risk premium is 7.5%; and small stock equity risk premium is 1.7%, for a build-up approach cost of equity capital figure of 15.6%. Under the CAPM approach for this division, Mr. Reilly selected a very low beta of .42. The Court believes that selection of this low beta factor which is not justified by the evidence results in an overstated valuation for this division. By referencing Ibbotson's, Mr. Reilly selected a market equity risk premium of 7.5%. From the same service, Plaintiffs selected 1.7% for the small equity risk premium. The CAPM cost of equity capital is determined to be, Ke = 6.35 + .42(7.5) + 1.7 or 11.2%. No additional risk premium specifically associated with this division is indicated, according to Plaintiffs. A 70% equity to 30% debt ration is selected. A cost of debt capital of 8.5% (5.1% after tax) is selected. After weighting of the cost of equity capital of 13.4%, considering the equity to debt ratio, a WACC of 11% is calculated. A relatively low long-term growth rate of 2% is adopted. Subtracting 2% from the yield capitalization rate of 11%, a direct capitalization rate of 9% is determined. Projected net cash flow of $30,335,000.00 divided by the direct capitalization rate of 9% results in a rounded fair value of equity for Siegel-Robert Automotive and Appliance Division of $530,900,000.

G. Consolidated Evaluation
Additionally, Mr. Reilly made valuation calculations based upon the discounted cash flow method or (DCF) method on a consolidated basis; i.e., all six business units were valued as one entity. He was comfortable in making the evaluation by use of this method because of availability of audited financial statements and projections for one year into the future. This process involves projecting economic income. He considered net operating income, cash flow, and debt-free net income. He calculated net cash flow into the future then brought it back to the evaluation date at a required rate of return. The DCF method permits projection each year at different growth rates. This method is generally similar to the capitalization method, but the direct capitalization method has a one year projection and the DCF method has five years projected. The first step is to determine a weighted average cost of capital (WACC) according to the same method used in the direct capitalization method. The total cost of equity capital used by Mr. Reilly is 12.7%. This was determined by averaging the "build-up" method calculation of 14% (risk-free rate of return of 6.4% plus long-term equity risk premium of 7.5% plus small equity premium of 0.1%) and a CAPM figure of 10.55 rounded to 10.60% (Ke = 6.4 [risk free rate] + .42 [beta factor] × 7.5 [long-term equity risk premium] + 1.0% [small stock equity risk premium]). Debt invested capital is calculated at 30% and equity invested capital is calculated at 70%. The weighted average cost of capital is determined to be 10%. This is determined by multiplying the cost of equity capital, 12.7% (the average of the "build-up" figure of 14.9% and the CAPM figure of 10.6%) times actual equity invested capital of 70% which produces a figure of 8.89% rounded to 8.9%. This is added to the calculation of after-tax cost of debt capital (5.1%) times debt invested capital of 30% producing a figure of 10.43%, the WACC which Mr. Reilly rounds downward to 10.0. This is a present value discount rate. This rounding process slightly overstates the value of the Company.
The next step is to calculate cash flow over the next five years. He used management projections for 1998 and historical data for 1995, 1996, and 1997. He projected revenues at 6%, higher than management projected for 1998. Management projected growth at 3.4% or at the same rate for inflation. In 1996, it was 18.7% and in 1997, it was 12.7%. It was determined that the company grew at a rate of 16% per year for each of the five years before the evaluation date. Siegel-Robert Automotive and Appliance Division grew at 6.9%. His analysis assumes no more acquisitions. He believes this is a conservative theory. The 1997 net cash flow of $75,444,000 is recognized by Mr. Reilly as *899 a high level. The plant would operate, he projected, at net cash flow for 1998, according to management projections of $46,343,000; for 1999 of $45,990,000, according to his projection; $48,749,000 for the year 2000, according to his projections; $53,682,000 for 2001, according to his projections; and $56,903,000 for 2002, according to his projections. He then calculated a present value for 1998 of $44,187,000, for 1999, $39,863,000; for 2000, $38,414,000; for 2001, $38,455,000, and for 2002, $37,057,000. Then, he applied a direct capitalization method analysis by capitalizing cash flow for 2003 of $66,555,000 at 6% (assumed growth rate) into perpetuity. He then arrives at a terminal value or a total value of the business at the end of the determined projection. He stated that it was difficult to project on a year-by-year basis into the future, but by using a direct capitalization analysis, it is possible to estimate the value of the business at the end of a discreet projection period which is selected as 2003, and he thus arrived at a terminal value of $1,109,251,000. He determined the present value of terminal cash flow to be $688,758,000 by applying a present value factor of 0.621%. Present value of the terminal value of $1,109,251,000, as of July 31, 1997, according to him, is $688,758,000. He added an interim cash flow value of $197,975,000 to the terminal value of $688,758,000 to arrive at an indicated MVIC of $886,733,000. Then, by subtracting out long-term debt of $372,000 and adding the cash balance of $201,973,000, he arrived at an owner-equity value of $1,088,000,0000. This is the final valuation under his DCF approach. This is a middle-level or marketable minority interest value. It is the Court's view that this analysis involves many subjective features which diminishes accuracy of the result.
The enterprise or control value of a company, it is agreed by all, is the highest valuation of the company, because that approach necessarily includes consideration of the value of control or power over the company. Passive or minority shareholders lack control over company decision making. They lack the ability to readily trade their shares in an open market environment. This explains why a price paid to take over a company exceeds the price of the stock trading at the time. The company taking over the other company is buying control.
Mr. Reilly concludes that when minority shareholders are squeezed out they get no benefits for future company developments such as Subchapter S elections or participation in an initial public offering. He thinks the Company is a strong candidate for such an offering because of its history of growth, profitability, strong balance sheets, strong management, and shareholder equity positions. Candidates for initial public offerings are those with less debt, companies operating in growth industries, companies with five years of audited financials, companies with adequate growth, and stock that can be priced within a reasonable range.
Reilly believes that the appropriate value in this case is the enterprise or control value and would add a control premium to the marketable minority interest value. The premium Mr. Reilly would add is an amount to take into account the price that an acquirer would be willing to pay. He relied upon what he regarded as an authoritative publication of W.T. Grimm Mergerstat Review in arriving at a 35% premium to take the stock under his prior calculations to the enterprise value. He believes, based upon this authoritative source, that 35% is a conservative approach. Mr. Reilly concluded that the enterprise level evaluation under the guideline publicly traded company method would be $1,361,000,000; the enterprise value under the direct capitalization method would be $1,146,000,000; and the enterprise value under the discounted cash flow method would be $1,469,000,000. He then *900 weighted the three methods equally and came up with a value of $1,325,000,000 or a per share value of $98.40.
Mr. Reilly justifiably criticizes the $20 per share figure paid to minority shareholders as unreasonably low. When subjected to a price earnings ratio comparison of the Company to the market place, considering 1999 earnings, the price earnings ratio at $20 per share would be 3.6. The price earnings ratio from the DOW Jones Industrial Average is 18.9; for Standard and Poor's 500 is 29.3; and for ValueLine is 17.6. (ValueLine tracks privately traded companies.) According to Mr. Reilly, the Company is New York Exchange eligible for trading and would be at the bottom of the Fortune 1000 list. Mr. Reilly's comparison when discounting from the enterprise valuation for the marketable minority interest would be at a price of $72.40 per share and would reveal a price earnings ratio of 13.3. Mr. Patton's evaluation mid-level value of $46.20 per share would calculate a price earnings ratio of 8.4.
The Court has outlined the general perimeters of Plaintiffs' expert's testimony which the Court believes is significant in reaching ultimate conclusions. Generally, Mr. Reilly's testimony was persuasive and convincing, but it is obviously proffered in an adversarial setting and is not without flaws, some of which have already been noted. Mr. Reilly did not adequately consider market risks in his analysis. Over a long period of time, few companies enjoy sustained growth and success. In the long run, many enterprises fail, e.g., the Company acquired the Seba Company in July, 1985. It manufactured business furniture at Greenwood, Arkansas, including desks, file cabinets, credenzas, and book cases. It was closed in early 1989. Reilly's calculations, in the Court's view, do not adequately consider risk of market forces, particularly in adopting his growth rates far into the future. The Court believes that Mr. Reilly's calculations overstate the marketable minority interest value of the shares of the Company.
Defendant's experts offer criticism of Mr. Reilly's conclusions that are, in some respects, beneficial to the Court in making its determination of fair value. Defendant's expert, Z. Christopher Mercer, is with Mercer Capital Management, Inc., of Memphis, Tennessee. He formed Mercer Capital in 1982, and it now has 38 employees. The company provides valuation services, works in the gift and estate tax field, and produces opinions that facilitate transactions. He has published books which are commonly relied upon by others in the industry. He does work for the American Society of Appraisers, where he was member of the Board of Examiners. He is a prolific author. He was retained to review Mr. Reilly's fair value opinion and to rebut the report. He concluded that there was no reasonable basis to understand the evaluation of the Company based upon Mr. Reilly's report, noting that he discovered errors, inconsistencies, and biases therein. He found a bias in Mr. Reilly's methodology that overstates values. He found missing from Reilly's report common sense, informed judgment, and reasonableness. Mr. Mercer criticized Mr. Reilly's definition of fair value, application of his guideline company method, application of his direct capitalization method, application of his discounted cash flow method, and application of a control premium. Mr. Mercer does not proffer an alternative valuation opinion.
Mr. Mercer found 153 comparison guideline companies which he believes would have been comparable, and notes that Mr. Reilly only selected 6. He challenges the selection of the particular companies picked by Mr. Reilly, concluding that Advantek is really dissimilar to all of the guideline companies selected.
The following are formulas used by Mercer:
*901
1. Value = Earnings × Multiple.
 (V = E × M)
2. Multiple = 1 / Capitalization Rate.
 M = 1/CR (CR = 1/M)
3. CR = discount rate - expected
 growth rate.
 CR = R - G.
4. a. Public stock pricing to get price
 earning ratios (PE)
 P/E = 1/R (rate of public company)
 - G (expected growth rate of
 public company).
 1/P/E = CR
 b. Buildup method using capital asset
 pricing model. With this, there is
 an attempt to develop a discount
 rate based on the model.
 R = risk-free rate (published government
 sources) + a number
 called beta (Based on risk of a
 company to the broader market
 retrievable from the Ibbotson and
 Associates resource) times large
 stock premium from Ibbotson's +
 a small stock premium added
 (from Ibbotson and Associates) +
 a specific company risk factor
 (based on judgment of evaluation
 analyst).
 CR = R - expected growth.
Mr. Mercer believes that growth is extremely important in the public market. If double digit growth is expected and only single digit growth exists in a small company, it is necessary to make adjustments. Mr. Mercer criticized Mr. Reilly for his failure to explain the development of the discount rate he used. Mr. Mercer believes that a basic flaw in Mr. Reilly's calculations is his application of expected growth rates. Mr. Mercer points out that Mr. Reilly used five year averages of earnings of companies with loss years and compared subsidiaries of the Company with no loss years, thereby overstating the multiple of the five year earnings of the subsidiaries. Mr. Mercer points out that most of the guideline companies selected by Mr. Reilly exhibit this same flaw. Additionally, he picked guideline companies with low earnings in the last twelve months compared to prior year earnings. Five of the six companies selected had this flaw. Therefore, in his view, the companies are not really comparable to Advantek. The misuse of guideline company data by Reilly tends to overstate values of the subsidiaries and fails to consider the exceptional nature of public market pricing. When earnings of a comparable company go down in the last twelve months and a price earnings multiple is applied for that period, price can be overstated by 70%. This, according to Mercer, is a problem with all of Reilly's calculations. The Court agrees, as previously noted, that in some instances the growth rates selected by Mr. Reilly are too high, and as a result, valuation of some divisions using growth rates that are higher than the evidence supports inflates the values of those divisions.
Mr. Mercer emphasizes that in his calculation in arriving at a discount rate of 17 for Advantek. Mr. Reilly uses a corrected beta .94 with no specific risk mentioned. There should be some specific rate for risk for Advantek because that would increase the discount rate and decrease value. Mr. Mercer points out that Mr. Reilly compared two companies to Advantek, one with a $6 million net worth and one with a negative $30 million net worth, when Advantek has a $56 million net worth. In the same comparison of companies, one has a price per common share of $1.063, one has a price of $3.337, and one has a price of $0.188. These are typically high risk companies. Mr. Mercer concludes that his choice of comparable companies when they are not really comparable causes his ultimate conclusions to be flawed to some extent. Additionally, Mr. Reilly used a five year average of earnings of companies with loss years and compared those to subsidiaries of the Company which had no loss years in earnings. This overstates the multiple of the five year earnings of the subsidiaries and causes his guideline companies to be non-comparable. Of the guideline companies selected, all but one had losses at some time from 1992 - 1997. One of the companies selected had a loss in earnings over the five year average. Selecting companies with low earnings in the last twelve months as comparables, when compared to prior earnings, causes a major flaw in the calculations tending to overstate the value of the subsidiaries, according *902 to Mr. Mercer. When companies are selected that have losses in earnings, values can be overstated for the company being valued by as much as 90%. When the multiple is overstated, which Mr. Mercer concludes they are, value is overstated. The Court is not convinced that the calculations of Mr. Reilly, either in the adopted beta factor or in Mr. Reilly's failure to apply a specific rate of risk beyond risk factor incorporated, based upon actual data, overvalued Advantek. The Court has already noted that his selected growth rate for Advantek is too high, based upon all of the evidence in the case.
In his report, Mr. Reilly said that the pre-tax margins were higher than for the guideline companies. They are significantly higher, Mr. Mercer says, suggesting that Advantek is quite different than the other comparables. The effect of selection of the comparables of Mr. Reilly is to systematically overvalue Advantek. The 88.8% debt to capital ratio is clearly not comparable, and it demonstrates that selection of Micro Electronic Packaging, Inc. was not a good choice. Mr. Mercer points out that Reilly failed to consider the impact of capital expenditures in excess of depreciation.
As Mr. Mercer stresses correctly, Mr. Reilly calculates the WACC to be 16. He then calculates a direct capitalization rate of 16% less an expected long-term growth rate of 7% finding the direct capitalization rate to be 9%. The guideline method produces an evaluation of $221 million, and the capitalization method produces a value of $122 million or a $99 million difference. No attempt is made at a reconciliation or explanation. This suggests to the Court that one of Mr. Reilly's evaluations is flawed, either the guideline publicly traded company approach or his direct capitalization approach.
Mr. Mercer criticizes Mr. Reilly's use of a low beta factor in implementing his direct capitalization method application on a consolidated bases analysis. He opines that low betas are sometimes a result of no or low trading volume. To demonstrate, if a beta factor of 88 is implied, rather than a .42 beta factor, that application alone would account for a difference of between 10.55% and 14%. (Ke = 6.4% × .88(7.5) + 1 or 14 and Ke = 6.4 × .42(7.5) + 1 = 10.55). A lower cost of equity capital (Ke) results in a higher valuation of the Company Mr. Mercer believes the beta factor for the Company should be at 1.0. Four of the guideline companies selected by Mr. Reilly, the Donnelly Corporation, the O'Sullivan Corporation, the Standard Products Company, and Atlantis Plastics, Inc. have low beta factors. The Court is persuaded, as noted above, that Mr. Reilly's beta factors are too low in some instances and is also convinced that Mr. Mercer's beta factor is too high.
In his discounted cash flow method analysis, Mr. Reilly gets a weighted average cost of capital (WACC) of 10.4% and rounds it down to 10%. Mr. Mercer believes this is too low. Rounding down had a multi-million dollar impact upon the evaluation. The Court agrees. By rounding from a proportion of 70 to 30 for the equity to debt ratio rather than an actual equity invested capital to debt invested capital equation of 75 / 25, Mr. Mercer correctly notes that an increase in valuation occurs. Mr. Mercer concludes that the capital structure should be 75% / 25% and not rounded to 70% / 30% and that the beta should be raised from .42 to .88. With those changes, he calculates the WACC rises to 14.45% changing the discount rate from 10% to 12.11%, he believes, resulting in a lowering in the value of the Company very substantially.
Mr. Mercer notes that Mr. Reilly's long-term growth rates for Advantek is 7.0%; for Continental Disc Corporation is 5.0%; Correl, Inc., 5.0%; Dolch Computer Systems, Inc., 7.0%; Sensidyne, Inc., 3.0%; and for Siegel-Robert Automotive, 2.0%. The weighted average would be 3.7%, but the implicit growth rate used by Reilly's DCF analysis is 4.8%. In his price to earnings ratio analysis and the guideline method. Mr. Reilly implies growth rates above *903 the 4.8% level, and by not reconsidering these factors, he overstates the value of the Company. The Court agrees that in some instances Mr. Reilly's stated growth rates are too high.
The Court is persuaded that Mr. Reilly's calculations do overstate the value of the Company, but not to the extent suggested by Mr. Mercer. Mr. Mercer observes that earnings of Siegel-Robert Automotive and Appliance Division are expected to be down from $63 million to $55 million. Earnings of all subsidiaries are expected to be 13.3%. Mr. Mercer states that by capitalizing $63 million instead of $55 million. Mr. Reilly seriously overstates the value of Siegel-Robert Automotive and Appliance Division. The Court agrees that Mr. Reilly overstates the value of this division.
Kenneth Wayne Patton, President of Mercer Capital, mostly performs business appraisals and writes. He and Mr. Mercer are the only owners of the company. He believes the non-marketable minority interest value is $30 per share. He is an accredited senior appraiser of the American Society of Appraisers. In 1989 to 1994, he was a member of the Board of Examiners; in 1997, he was vice-chair of the Board of Examiners and prepared a report under the Standards of the American Society of Appraisers. He is a member of the Valuation Committee, has written many articles and books, has given speeches and lectures, and has an MBA degree in finance. He performs several hundred appraisals annually. Mr. Patton acknowledges there is no definition of fair value. It is necessary, therefore, to consider the Missouri statutes, cases, and literature.
Mr. Patton concluded that the minority shareholders in this case have a relatively small percent of the total shares. They had no right to appoint management or to set compensation, and he concluded that he was dealing with a minority interest where marketability discount would be appropriate. Mr. Patton believes that a marketability discount deducted from the equity interest is indicated because the interest of the minority shareholders lack marketability. The controlling interest is with the family, tending to reduce marketability of the minority shares. There are no restrictive agreements, which is a positive factor in the sense that it would tend to reduce the marketability discount. At the time the controlling shareholder was advanced in age and his death was contemplated, there was a need to consider succession of the Company. No sale occurred because the Company was not for sale. This. Mr. Patton regards as an important factor. He found that transactions in the shares were infrequent. There had been no sale of significant assets and no plans to make such sales. Dividends are paid on a regular basis, another positive factor tending to reduce the marketability discount. There was no purchase demand from third parties, a factor he considered in favor of imposing a marketability discount and suggesting that it be more substantial. Additionally, he considered the size of the block of stock involved, concluding that it was a sizeable investment and that it becomes difficult to find individuals or entities willing to invest large sums of money in a relatively small ownership interest. That factor, he suggests, tends to increase the marketability discount. Positive factors against a marketability discount are positive dividend history, favorable earnings and favorable growth. Mr. Patton looks at the Company as a diversified manufacturing company which he divides into units as follows:
1. Siegel-Robert Automotive and Appliance Division  53%
2. Advantek, Inc.  20%
3. Dolch Computer Systems, Inc.  12%
4. and the Other subsidiaries combined  15%
He considered each subsidiary separately, but valued the Company as one unit. His general observations are that it is a large closely-held business that is very profitable, well capitalized, very liquid, *904 with low debt, and well managed. Siegel-Robert Automotive and Appliance Division produces plastic parts for the automotive industry in a cyclical environment. It has been operating at or above capacity. At that operation level, he would expect it to produce very positive results. It has no ability to create prices for the ultimate customer, thereby lacking pricing power. There is a great deal of pressure within the industry to reduce prices, and there are obvious customer concentrations. Operating income from 1993 - 1996 was flat when adjusted for inflation. In 1997, the plant operated above capacity and income rose. It had a gross profit in 1993 of 29.8% and a gross profit in 1996 of 26.4%. There was a decline in margins in an atmosphere of favorable results. Sales were increasing, but the company was losing ground in maintaining its margin of profit.
Mr. Patton states that Advantek enjoyed a very favorable period of growth in sales and earnings when it had an advantage technologically in packaging chips. It lacks pricing power and prices it receives are consistently declining as performance is expected to constantly rise. Its raw material and technological advantage enjoyed in the early 1990's have waned. There was rapid growth from 1993 to 1997 of $32 million to $98 million. The rate of growth began to slow and the growth in sales began to slow. Operating income for 1997 of $20 million was slightly below the operating income in 1996 of $21 million. A review of percentage income statements reveals margins are coming down.
Mr. Patton observes that Dolch customers are substantially concentrated, a significant factor when the number one customer was lost. The founder of the company, president of that division, is recovering from an illness. He is the central figure in locating its customers for this specialized business.
Some common characteristics of the Company as a whole, he suggests, are its lack of pricing power, the cyclical factors in the Siegel-Robert Automotive and Appliance Division, and the lack of technological protection in each company. In every case, there are relatively minor product lines and concentrated customers. The Company has engaged in an aggressive acquisition strategy to diversify risks, which has been effective over the last five years in producing a profitable enterprise. The advantages gained over that period are diminishing.
In Mr. Patton's actual evaluation methodology, he develops a capitalization factor, develops ultimate earning power factors, and then makes an application of non-operating assets. Mr. Patton first considered the transactions method as a valuation technique by looking at transactions in stock. He found few were reported. The Geiser trade was reported at $19.70 a share. He characterized it as an arm's length transaction. This single transaction did not provide a sense of marketability to his satisfaction, so he did not use it. He next considered the net asset value method. This is a cost-base approach which he regards as very common. Believing information for adjustments to book value were insufficient, he concluded that other valuation methods would be preferred. The next analysis was the operating cash analysis approach. The Company had in excess of $200 million in cash on July 30, 1997, which he believes could be considered a non-operating asset  an asset that is identified as owned separate from the company comparing on-going operations. He concluded that non-operating cash was $154 million. He understands that Mr. Anderson disagrees with his treatment of cash. Mr. Anderson believes that all cash is required for operations in the company, and Mr. Patton understands that this calculation is a consideration that calls for judgment. Appraisers do not consider non-operating cash in addition to value on a dollar for dollar basis.
He considered that the Company had a long-standing history of charitable contributions. He eliminated those with the result that there would be a higher value for the stock. He eliminated non-recurring *905 gains of $6 million. He considered capital expenditures, finding the Company spent $40 million in 1995, $27 million in 1996, and $30 million in 1997. This suggests that the Company agreed not to build additional plants and is indicative of what the Company needs in the future in terms of cash to complete its operations.
Mr. Patton uses an adjusted capital asset pricing model (ACAPM) as an evaluation tool. This combines elements of the "build-up" or summation method ("builds up a capitalization rate based upon broad financial market returns and the relative risk profile and growth prospects of the subject company") with those of the capital asset pricing model. The components of the build-up method in developing a capitalization rate are: (1) an appropriate tax-free rate of return or customarily a U.S. Treasury security (30-year treasury bond yield which as of date of valuation was 6.39%); (2) an equity premium or common stock premium over the risk free rate computed by examination of the public market  6.5%; (3) a specific company risk premium (represented by Standard and Poor's 500 index) which looks at returns on publicly traded stocks which typically have some volatility which cannot be explained by the beta factor  2%, and (4) an expected long-term growth rate based upon the Company's historical performance and future outlook  4%. The ACAPM differs from the CAPM in that it attempts to develop a specific capitalization rate for a private company.
Mr. Patton explains that he is looking for an investor's return. The risk-free rate which he selects is the 30 year Treasury Bond. It is what any investor can expect risk free. His calculation, as noted, included the rate of 6.39%. Ibbotson's common stock premium reflects an equity security involvement with some risk. He selected 6.5%. Ibbotson's provides rates of return from stock market analysis back to the 1920's. He selected a neutral market beta of 1.0 as a measure of relative volatility. After reviewing Ibbotson data, he concluded, considering the size of the Company, that it was not appropriate to make an additional adjustment, so the small capitalization stock premium selected is 0.0. Any value above 0.0 would result in a lower value of the stock. For the Company's specific risk premium, he imposed 2%. Not all risks of a specific company are derived from the general broad market conditions. The discount rate he used is 14.89%. It defines the investor's required rate of return. This is the gross required rate of return from which he subtracts a growth rate.
The sustainable growth rate in earning power is expectational in the long-term. It is not intended to be the rate for a historical period. The rate he selects is 4%. This is a rate that would be projected into perpetuity. He recognizes 4% is a conservative growth assumption. He admits that the selection of the lower growth rate has the effect of producing a lower valuation of the Company. He recognizes that growth is a factor in both the guideline and the capitalization calculations. He agrees that a 4% growth rate has a significant effect on the bottom line evaluation. He agrees it is appropriate to consider the historical growth and admits that the Company's historical growth rate from 1993 - 1997 was 13%. The Company had a three-year 17% growth rate and an actual growth rate of net income for 1982 - 1997 of 20%. He acknowledges that the Company's revenues in 1997, assuming a growth rate of 4% in 1982, would be $100 million, when in fact, they were about $530 million in 1997. The projected growth rates of five or six of his guideline companies ranged from 13.3% to 20%. He said he was not aware that the Standard and Poor's growth rate for 20 years is 12%, or that the 20 year compound growth rate for the New York Stock Exchange was 11.7%. He recognizes that the long-term growth rate for inflation in 1997, was 2 to 2 1/2%.
The 4% expected growth rate is subtracted from 14.89% to arrive at the capitalization rate. It is the Court's belief that Mr. Patton's selected growth rate is too low. His capitalization rate is calculated *906 as 14.89% - 4% or 10.89%. The formula used is 1 / capitalization rate or price earnings ratio of 9.1827 or rounded up to 9.2, which is called the ACAPM capitalization factor. He determines ongoing earning power to be $57,932,000 × ACAPM of 9.20 = the capitalized earnings value which is $532,974,000 + adjustments for non-operating cash + $154 million, which is the valuation indication direct capitalization of earning value, according to Mr. Patton, as $686,974,000. These calculations are set forth in the following table format:
Mr. Patton's ACAPM model calculations are as follows:

Long-Term Government Bond Yield
 Rate 6.39%
Ibbotson Common Stock Premium 6.50%
Beta Factor × 1.0
Small Company Capitalization Rate 0.0
Total Equity Premium 6.50%
Company Risk Premium 2.00%
Discount Rate (required rate of return) 14.89%
Reduce by Substantial Growth Rate in
 Earning Power - 4.0%
 _______
Industry Capitalization Rate (1/Price
 Earnings Ratio) 10.89%
Minority Interest Capitalization Factor
 (1/CR, or P/E ratio) 9.18%
ACAPM Capitalization Factor 9.20%

The growth rate of 4% is not indicated by the performance of the Company. Selection of a lower growth rate results in a lower valuation of the Company, when the growth rate is plugged into his formula, 15.9% is the four-year growth rate of the Company. Ms. Michelle Matava, an expert witness called by Plaintiffs, demonstrates that by using a 5% growth rate rather than a 4% growth rate, making no adjustment for the beta, the value of $686,624,000 becomes over $739 million just by a 1% increase in the growth rate, 5% is still significantly below the four-year compounded growth rate. The Court is persuaded that Mr. Patton's growth rate of 4% is contradicted by the evidence in the case.
Mr. Patton acknowledges that selection of the beta factor involves judgment. A beta of 1.0 for a security suggests that a given percentage change the return on the market will be matched by the same percentage change in the return on the security. With a security having a beta of less than 1, expected changes in the return on the security would be less volatile than those of the market. Selecting a beta of 1 suggests that the closely-held stock has the same expected volatility as the market index used in deriving the market equity premium over the risk free rate. Straying from that conclusion would be indicated where there is a reasonable group of guideline publicly traded companies with historically stable and closely correlated betas from which to calculate a meaningful industrial average beta.
Ms. Matava notes that a beta is a consideration of an indication of market risk of a security. A selected beta of 1 indicates that if the market is up 10% you will expect 10% return. A beta of one is reflective of the market. A beta of greater than 1 means there is more volatility. With a beta of more than 1, a security would move more than the market. With a beta of 1, you are saying that an investment in the company is the same as an investment in the market index. She believes that a beta selection of 1.0 is not appropriate here. The effect is that if the beta is actually less than 1, and 1 is assumed, the value of the Company is understated. The Court is persuaded that the more scientific approach in determining the beta factor is reported by Ms. Matava. Assumption of a beta factor of 1 understates the value of the Company Ms. Matava used 4 or 5 companies to calculate an unlevered beta of .84. Unlevered beta is affected by leverage debt of the company in relation to overall structure. High debt suggests there is more volatility. She did a weighted average of the companies based on relative size and considered that the Company has very little debt. As noted previously, the Court is convinced that the beta factors selected by Mr. Reilly were too low.
Mr. Patton's guideline publicly traded company method is described as a market approach. He looked at publicly traded *907 stocks, which he describes as reasonably comparable, that can be applied to the subject company. He looked at companies that make the same product and used a total of 6. He looked at many factors including descriptive material, sales, market capitalization, products, and markets. He looked for non-automotive companies but rejected those he reviewed. He elected not to value the Company on a subsidiary by subsidiary basis because he could not find information which he concluded would be useful for that purpose. He concluded that he could use the automotive group of companies and apply other financial factors and arrive at a more accurate valuation. His election to value the Company as a 100% automotive parts manufacturing company seriously disables his analysis. All agree that substantial growth and strength of the Company lies in its intentional decision to diversify into the technology field to lessen the impact of market forces in a very competitive environment with constant pressure to reduce prices and improve productivity. It is in the automotive and appliance division where relative growth has dwindled in comparison to the other divisions. All of his guideline companies were auto parts manufacturing companies. In reality, the Company is seven different business units. Greater than 40% of the subsidiaries are not in the auto parts manufacturing business. Advantek, accounting for almost 20% of the Company, has no connection to the auto parts manufacturing business. A greater part of increases in revenue over the last few years comes from the subsidiaries, not from the auto parts division. Advantek had a four-year compound growth rate of over 25%. To value it as the automotive parts manufacturing company ignores the growth rate of Advantek and of all the subsidiaries. By using the automotive parts manufacturing companies for comparison, Mr. Patton shifts the focus of his analysis where application of his multiples will necessarily result in a lower valuation for the Company. A bias for lower valuation is built into his analysis. This is particularly important, because implementation of his weighting methodology relies 80% upon the guideline publicly traded company method and only 20% on the direct capitalization method. Mr. Patton admitted that about 50% of the Company is in industries having nothing to do with the automotive industry. He admits that only Acro, which is a very small part of the Company, is involved in the auto industry, along with Siegel-Robert Automotive and Appliance Division. Mr. Patton also confesses that he recognizes that Advantek and other subsidiaries have higher growth rates than the Siegel-Robert Automotive and Appliance Division. He admits that all of the subsidiaries have different cyclical patterns than the Siegel-Robert Automotive and Appliance Division. The price to net income ratio for his six selected guideline companies ranged from a low of 12.17 to a high of 19.31 with a median of 15.87. The actual price to net income ratio he chose was 11.10, which is lower than all six of the guideline companies.
He concluded that the Company is large for a family business and has little or no debt compared to public companies, which is favorable for determining a higher value for the Company. He found that margins for the Company were much higher than for guideline companies. The growth rates for companies selected had substantial expectations for future growth. Expectation of growth for the Company and for the guideline companies was an adverse factor in his analysis. He considered the management to be competent. He concluded that the management would be challenged by many changes in all of the businesses.
Mr. Patton's conclusions in arriving at a value for the Company under the guideline publicly traded method are not persuasive. The median annual revenues of his selected companies were 1.5 billion dollars compared to the Company's annual revenues which he shows as "adjusted" to be $535,000,000. The guideline companies generally have higher debt to equity ratios than *908 the Company. The Company has lower fixed asset intensity, higher equity capital, and cash flows than the guideline companies and consistently higher operating and pre-tax margins than the median for his guideline companies.
Mr. Patton's imposition of a 30% "fundamental adjustment" in calculating base guideline capitalization factors of "sales," EBITDA, EBIT, "net income" and "book value," so seriously flaws his guideline publicly traded company analysis that the Court rejects its conclusions as being scientifically unsupportable and unreasonably advanced based upon all of the evidence in the case. His sales multiple of $535,204,000; EBITDA multiple of $112,643,000; EBIT multiple of $92,296,000; net income of $57,932,000; and book value of $320,714,000 are subjected to this fundamentally adjusted guideline company capitalization factor. In making calculations of market value of total capital to sales. EBITDA and EBIT, the base guideline capitalization factors ranged from 0.78 for sales, 7.01 for EBITDA and 11.31 for EBIT. Guideline capitalization factors of price to net income are calculated at 15.87 and price to book value at 2.30. After making a fundamental adjustment of a 30% reduction, guideline capitalization factors on market value of total capital to sales becomes .55; for EBITDA, 4.90 and for EBIT, 7.90. Price to net income becomes 11.10 and price to book value becomes 1.60 as guideline capitalization factors. His guideline companies on market value of total capital to revenues ranged from .47 to 1.50 with a median of all six selected guideline companies of .78. After Mr. Patton's fundamental adjustment of a 30% reduction, the market value of total capital to revenues (sales) becomes .55 which is lower than five of his six guideline companies. The EBITDA for the six guideline companies ranged from a low of 6.44 to a high of 9.58 with a median of 7.01. After his 30% discount, he arrived at 4.90 which is lower than all six of his guideline companies. For the EBIT, his selected guideline company calculations range from a low of 9.46 to a high of 12.97 with a median of 11.31. After the fundamental adjustment, he selected 7.90 which is lower than all six of his guideline companies. The price to book value multiples for his selected guideline companies ranged from 1.87 to 2.84 with a median of 2.30. He adopted 1.60 which is lower than all six of his guideline companies. Of all six multiples he used, only one has a single multiple not lower than the lowest. The lower multiples he selects, the lower his evaluation conclusions become. Ms. Matava explains that selecting a sales multiple at the high end of the range .55 to 1.5 changes the value from $474,990,000 to $956,000,000 with "all other things being equal."
In making his final guideline publicly traded company evaluation, Mr. Patton subtracted interest bearing debt of $372,389 from the sales. EBITDA and EBIT columns and added an adjustment for non-operating assets (cash), arriving at an adjusted capitalized value for total common equity, based on the sales analyses of $447,990,000; EBITDA analysis of $705,578,000; EBIT analysis of $882,766,000; net income analysis of $797,045,200; and book value analysis of $667,142,000. Rather than rejecting the capitalized sales indication as an outlier, he imposed a weighting measurement, giving the already "fundamentally adjusted" indicator an 80% weight to a 20% weight for the higher Direct Earnings Capitalization Method (using ACAPM) which was $686,977,000. Of the 80% weight, he applied one-half of that, or 40% of the total to the capitalized sales indication of value which was the lowest at $447,990,000, to arrive at a correlated indications of value of $621,843,900, justifying the action "to reflect a hypothetical investor's uncertainty concerning the sustainability of Siegel-Robert's profit margins in light of significantly lower guideline company margins."
This calculation was made after using an already recognized low growth rate of 4%. Mr. Patton assigned the lowest 10% weight to EBITDA. EBIT, capitalized earnings, and capitalized book value, all of *909 which had the highest indications of value. To the capitalized sales evaluation, the lowest indication of value of $447,990,000, he assigned a 40% weight. Of the total weight assigned to the guideline company method of 80%, one half of that is assigned to the lowest value indication which is capitalized sales. His capital sales multiple of $477,990,000 million is a clear outlier when looking at all of the other values under the guideline company method. The capitalized EBITDA figure is $705,578,000; the capitalized EBIT is $882,766,000; capitalized earnings are $797,450,000; and capitalized book is $667,142,000. A strong argument can be made that this multiple should be discarded or another analysis should be made to determine whether an error was made in the calculations or in the assumptions that would yield that figure. After his weighting procedure was employed, he arrived at a figure of $621,843,900, the value of the marketable minority interest, and when divided by the shares, the per share value would be $46.20. Mr. Patton made no control or enterprise value calculation. After considering all of the evidence in this case, the Court is persuaded that Mr. Patton's calculations are more designed to justify the unreasonable sum offered to minority shareholders at the time of the merger than to arrive at a fair value of those shares. The 30% fundamental adjustment discount is derived within Mercer Capital. This concept is not widely accepted in the industry. This manipulation by imposition of a full 30% fundamental adjustment in the name of science further discredits Mr. Patton's conclusions.
In addition to his other calculations which diminish the value of the shares, Mr. Patton imposes a marketability discount to the minority shares. His weighting process and calculations of a marketable minority interest evaluation with a marketability discount are set forth as follows:

Validation Indications Valuation Weight Product
 by Method Indications
Transactions Method $267,257,000 0.0% $ 0
Net Asset Value Method $474,714,000 0.0 $ 0
Direct Earnings Capitalization $686,974,000 20.0 $ 137,394,800
 Method (using ACAPM)
Guideline Company Method:
 Capitalized Sales: $447,990,000 40.0 $ 179,196,000
 Capitalized EBITDA $705,578,000 10.0 $ 70,557,800
 Capitalized EBIT $882,766,000 10.0 $ 88,276,600
 Capitalized Earnings $797,045,000 10.0 $ 79,704,500
 Capitalized Book $667,142,000 10.0 $ 66,714,200
 _________________________
 TOTALS: 100% $ 621,843,900
Conclusion of Value  Total Common Equity
(Marketable Minority Interest) (rounded) $ 621,844,000
- Marketability discount 35% $(217,645,400)
 ______________
= Conclusion of Value  Total Common Equity $ 404,198,600
Conclusion of Value  Total Common Equity
(Non-Marketable Minority Interest Basis) (rounded) $ 404,199,000
Conclusion of Value Per Common Share
Conclusion of Value  Total Common Equity $ 404,199,000
/Common Shares Outstanding 13,464,832
 _____________
= Conclusion of Value Per Common Share $30.02

*910
Conclusion of Value per Common Share (rounded) $30.00

After his "adjustments" and "weighting," Mr. Patton's imposition of a marketability discount upon the minority shares is calculated under what he calls a QMDM Model. It is based upon (1) assumed holding period of an investment in the examined company; (2) the investor's required rate of return; (3) interim cash flows; and (4) growth in the underlying marketable, minority interest base value. In this model, Mr. Patton makes many assumptions. For the holding period, he assumes ranges of 5 - 7 years, 8 - 10 years, and 10 - 20 years; for the rate of return, he assumes 15% to 18%; for the growth rate he assumed 6.0%; and he assumed an implied dividend yield of 1.8% with dividends expected to grow at the rate of 8.3%. Mr. Patton's marketability discounts, based upon these assumptions, for an average of 5-7 years is 34%; for 8-10 years is 45%; and for 10-20 years is 57%. He selected in this case to impose a marketability discount of 35%.

III. DISCUSSION
The central concern of the Court's legal analysis is fair value. The Court must discern Missouri courts' interpretation of this malleable term, focusing particularly on the appropriateness of application of minority or marketability discounts. Mo.R.S. § 351.455 provides that a shareholder who objects to a merger may demand of the surviving corporation "payment of the fair value of his shares as of the day prior to the date on which the vote was taken approving the merger or consolidation." In Phelps v. Watson-Stillman Co., the Missouri Supreme Court explained judicial determination of fair value as follows:
In the various statutes the terms `value,' `fair value,' `fair cash value,' and `fair market value' are abstract and in a sense perhaps meaningless; they nevertheless have the same general meaning and purposefully if not wisely establish a flexible general standard for fixing value between parties who are either unable or unwilling to voluntary agree. As previously noted, there is no simple mathematical formula and each case presents its particular problem, but in general some of the factors to be considered and weighted are net asset value, earnings, dividends, management, and `every relevant fact and circumstance which enters into the value of the corporate property and which reflects itself in the worth of corporate stock.'
365 Mo. 1124, 293 S.W.2d 429, 433 (1956) (citations omitted). While useful as general definition, Phelps's description of fair value determination does not speak to the salient issues in this case  the application of minority and marketability discounts. As explained earlier in this opinion, Defendant asserts that fair value of Plaintiffs' shares of Siegal-Robert, Inc. stock must include a minority discount to reflect these minority shareholders' lack of control over corporate decision-making and a marketability discount to reflect the fact that a ready market did not exist for Plaintiffs' shares. Plaintiffs, on the other hand, assert that both of these discounts would inequitably reduce the worth of their shares in violation of the purpose and spirit of § 351.455.
In this diversity case, this Court's duty is to determine and apply Missouri law. Thus, the Court's task "is not to formulate the legal mind of the state, but merely to ascertain and apply it." R.W. Murray v. Shatterproof Glass Corp., 697 F.2d 818, 826 (8th Cir.1983) (quoting Aguilar v. Flores, 549 F.2d 1161, 1163) (8th Cir.1977). While the Missouri Supreme Court is the final authority on this state's law, this Court may also rely on decisions by the Missouri Court of Appeals in ascertaining Missouri law: "Where an intermediate appellate state court rests its considered judgment upon the rule of law which is announced, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced *911 by other persuasive data that the highest court of the state would decide otherwise." West v. American Tel & Tel Co., 311 U.S. 223, 236-237, 61 S.Ct. 179, 85 L.Ed. 139 (1940) (quoted in Murray, 697 F.2d at 826). As the ensuing discussion will reveal, ascertaining the legal mind of Missouri on the issue of discounts is not a simple task, in large part because of the dearth of cases. It is with these few applicable cases that the Court begins its inquiry.
In keeping with their argument that neither discount should be applied in valuing their shares. Plaintiffs contend that this Court should determine the "enterprise value" of the Company and then calculate the value of Plaintiffs' shares on a pro rata basis. As discussed in the Court's Findings of Fact, enterprise value is the highest level at which a company's worth may be assessed, according to the parties' experts. Enterprise value has been defined as the amount "a willing buyer realistically would pay for the enterprise as a whole on the statutory valuation date." BNE Massachusetts Corp. v. Sims, 32 Mass.App.Ct. 190, 588 N.E.2d 14, 19 (1992).[6] Thus, enterprise value by its nature does not include a discount based on shares' minority status or lack of marketability, as the purchase contemplated gives the buyer total control over the corporation which the buyer has procured on the market. Missouri cases interpreting § 351.455 fair value do not specifically address whether such a determination should be based on a company's enterprise value. Nonetheless, both parties argue that Missouri fair value cases may be interpreted as indicating the state courts' approval or disapproval of valuing dissenting shareholders' shares at this level of value.
In Phelps, the court reviewed the findings of a referee who had been appointed by the trial court to assess the value of dissenting shareholders' shares. Noting that the referee had arrived at his fair value figure by establishing the net asset value of the company as of the date before the merger, Phelps rejected this method of arriving at fair value of minority stock when employed as the sole method of valuation. 293 S.W.2d at 432. Defendant urges the Court to interpret Phelps's holding as a rejection of the enterprise value method of valuation. The Court is not persuaded by Defendant's argument. Phelps explains that net asset value was "employed in its narrow meaning of `liquidation value,'" which the court goes on to explicate as the practice of valuing corporations based on the value of their assets were they converted into cash. Id. The Court does not construe such a liquidation value as at all identical to enterprise value, in which a buyer would take into account not only the tangible value of the company's assets but also intangible values including good will, expertise of management, and so forth. Thus, the Court finds that Phelps means what it says  that a court should not rest its fair value determination on net asset value alone  and also finds that Phelps does not address a court's use of enterprise value.
Flarsheim v. Twenty Five Thirty Two Broadway Corp., 432 S.W.2d 245 (Mo. 1968) is one of the cases on which Plaintiffs rely in their assertions that Missouri courts would favor valuing the Company by its enterprise value. Defendant vigorously disputes any reliance on Flarsheim because it involved a fair value determination under § 351.405, not § 351.455. R.S.Mo. § 351.405 provides that a dissenting shareholder may demand fair value of his or her shares after properly objecting to the sale or exchange of all or substantially all of the assets and property of a corporation.[7] While suspending for the moment *912 its full discussion of the usefulness of § 351.405 cases in ascertaining Missouri courts' interpretation of § 351.455, the Court notes the following. First, in the most recent Missouri § 351.455 case, King v. F.T.J., Inc., 765 S.W.2d 301, 303 (Mo. App.1988), the Missouri Court of Appeals stated that the court's opinion in Dreiseszun v. FLM Industries, Inc., 577 S.W.2d 902 (Mo.App.1979), a § 351.405 case, was "applicable to define fair value as used in § 351.455 relating to a merger," noting that Dreiseszun had explicitly extended the effect of its decision to all other statutes employing the term fair value. Second, Flarsheim pointed out that § 351.405's fair value provision was "the same" as that contained in § 351.455 and also cited Phelps, a § 351.455 case, as its authority in defining fair value. This Court interprets these Missouri cases as demonstrating the state courts' willingness to draw on § 351.405 cases in § 351.455 determinations and therefore will consider what it can learn from Flarsheim.
Flarsheim is valuable to the Plaintiffs because of its discussion of the purpose of dissenting shareholders' rights statutes. Stating that the "primary rule in statutory construction is to ascertain and give effect to the legislative intent," the court remarked that until changed by statutory enactment, shareholders' unanimous consent was required for the transfer of all the assets of a going corporation. 432 S.W.2d at 251. Thus, the court explained.
Statutes dealing with the sale of substantially all of a corporation's assets are designed primarily for the protection of dissenting shareholders of the corporation. It has been said that courts should be careful not to weaken or fritter away by construction the protection given minority shareholders in exchange for dispensing with the necessity of securing unanimous consent of the shareholders for the sale of all substantially all of the corporate assets.
Id. at 252 (citations omitted). Plaintiffs urge that this reasoning applies equally to a § 351.455 case, asserting that because the statute reflects a compromise, in which minority shareholders gave up their former right to unanimous consent for significant corporate decisions (such as dissolution or merger), to decrease their shares' worth by applying minority or marketability discounts violates the intention of the statute to protect, not penalize, minority shareholders. Thus, Plaintiffs argue, Flarsheim's concern for protecting minority shareholders indicates that the enterprise level of value is the proper level to be used in Missouri fair value determinations. Defendants contend, to the contrary, that Missouri legislature has never predicated a statutory merger on the shareholders' unanimous consent. Defendant points out that R.S.Mo.Ch. 33, Art. 6 § 5361, the 1939 statute which preceded § 351.455, required a three-fifths vote of the shareholders, so that § 351.455 actually increased the voting requirement to approval by two-thirds of the outstanding shares. Although Defendant is correct on this particular point, the argument it hinges on this point is not well taken. The requirement of unanimous shareholder consent as a prerequisite to fundamental corporate change was a tenet of common law. Voeller v. Neilston Warehouse Co., 311 U.S. 531, 536 n. 6, 61 S.Ct. 376, 85 L.Ed. 322 (1941). Accordingly, the Missouri legislature did diminish minority shareholders' power when it first removed this common law requirement of unanimity. Flarsheim interpreted § 351.405 as having been designed primarily for the protection of dissenting shareholders, as "the bargained exchange for abolition of the requirement of unanimous consent to approve a transfer of the assets of a corporation." 432 S.W.2d at 253. Whether this finding leads to the conclusion that Missouri courts would deem it inappropriate to apply minority or marketability discounts in a § 351.455 fair value determination is a question that the Court will take up in its discussion of King.[8]
*913 As noted supra, King is the most recent Missouri case evaluating a court's § 351.455 fair value determination. The most important guidance of this case, relied on heavily by Defendant, is its holding that the application of both marketability and minority discounts "in determining fair value pursuant to § 351.455, when a shareholder of a corporation objects to a merger or consolidation, rests within the sound discretion of the trier of fact after every relevant fact and circumstance is considered." 765 S.W.2d at 305, 306. Although both parties in their thorough briefs argue at various junctures that this case or that policy mandates that the Court apply or decline to apply discounts, the principle which emerges most strongly and clearly from King is that such a decision is discretionary. The Court's discussion of Missouri case law, as well as that of other states, must, therefore, proceed with the understanding that no law or policy requiring or forbidding the application of discounts may hold sway with the Court, which is required by its interpretation of Missouri law to rest its decision on its own discretion, after considering every relevant fact and circumstance.
King offers only a modicum of guidance on the question of application of a marketability discount. King held that there was no error in the trial court's declining to apply a lack of marketability discount to King's (the dissenting shareholder's) stock. King summarized plaintiff's expert witnesses as having testified that a marketability discount should not be applied because (1) the minority shareholders had been required to accept a cash payment in exchange for their stock from the merging company; (2) the company had a strong future; and (3) the company had just invested "tremendous amounts" in computers and advertising as well as in developing its products. King then found merely that these experts' testimony supported the trial court's decision to not apply a marketability discount, noting that the trial court can accept the testimony of one expert and reject the testimony of another. Id. at 304-05. In its discussion, the Court of Appeals simply recited that expert testimony which supported the trial court's decision and then found that the trial court had not abused its discretion. The court did not supplement this discussion with its own reasoning as to the appropriateness of a marketability discount; therefore, the Court does not glean from this part of the opinion any insight into the legal mind of the state.
King's discussion of minority discounts is more illuminating. The court notes that the trial court applied a minority discount of 7% in calculating the fair value of King's stock. The trial court came to this figure by applying the 15% minority discount employed by the company's expert witness to the 47% of the business not represented by saleable assets, which the trial court found were not necessary in the operation of the business. The Court of Appeals again summarized supporting expert witness testimony, which indicated that the company consisted of both an active operation and a personal holding company which invested its large amounts of assets much like a mutual fund. King then concluded that the 7% discount, which the company argued on appeal was too low, was appropriate on the facts before it because of the high percentage of saleable assets not necessary to the company's operation. Id. at 305-06. Significantly, King went on to recite its own reasons for the appropriateness of a minority discount in the case before it:
The judgment of the trial court reflects the fact that in the case at bar, Karen King's status as a minority shareholder diminished the value of her stock to the extent that the stock represented her interest in the active operation of the insurance agency and her lack of a controlling voice in that aspect of the company's business, but not to the extent that her stock represented an interest in the saleable assets held by the company *914 that were not necessary in the operation of the insurance agency business.
Id. at 306 (emphasis added). Thus, King employs the reason most often cited by courts who choose to apply a minority discount (and the reason most ardently argued by Defendant): that minority shareholders' lack of control over significant corporate decisions diminishes the value of their stock, and that the fair value of their stock must reflect this reality.
Another aspect of the opinion may offer additional insight in the legal mind of the state. That is King's employment of Dreiseszun, another issue hotly disputed by the parties. Dreiseszun is a § 351.405 case, relating to a dissenting shareholder's rights in the event of a sale or exchange of all or substantially all of a corporation's assets. As explained supra. King found that the Dreiseszun opinion was applicable to define fair value in a § 351.455 decision. King then referenced Dreiseszun as follows:
The court in Dreiseszun recognized that there is no simple precise mathematical formula for determining the fair value of corporate stock under § 351.405 or other statutes employing this term. The Court in Dreiseszun held that each case presents different elements of value and each case must be viewed separately.
Id. at 303. For the following reasons. Plaintiffs urge this Court to look to Dreiseszun for more than this recitation that fair value decisions are not precise but are each unique and case specific. In Dreiseszun, the Court of Appeals rejected the trial court's determination of fair value, finding that the trial court had "abdicated, at least in part, its responsibility imposed by § 351.405(3) to find and determine the fair value of plaintiffs' stock to the decision of some minority shareholders to accept the price of $23.00 per share, no matter what may have been their reasons and regardless of whether those decisions were based on sound accounting or business principles." 577 S.W.2d at 906. The Court of Appeals also criticized the trial court for stating:
"THE COURT: Your clients (plaintiffs) didn't have the company as a whole to sell. They only had a limited number of shares to sell."
With the following comment:
It would appear, therefore, that the court below in the situation before it would place a different "fair value" per share upon the same classification and kind of stock in a corporation depending upon whether the shares were held by a majority or a minority stockholder, and would find the value of the minority shares to be the amount which the majority stockholders were willing to pay for the minority shares and which a minority shareholder was willing to accept, whether a "fair value" or not, and hold the other minority shareholders to the consequences of that decision. Such is not the legal import or effect of § 351.405, supra. This statute does not by terms or any reasonable interpretation intend that a minority shareholder be in any way penalized for resorting to the remedy afforded thereunder.
Id. Thus, the court indicates that it disfavors valuing shares differently based upon their status as minority or majority. Later the opinion, the court makes clear that such a rejection of minority discounts is indeed what it intends:
The minority dissenting shareholders ... enjoyed certain fundamental rights as common stockholders in [the company], which are thus generally expressed in 18 C.J.S. Corporations § 215, p. 648:
A common stockholders is an owner of the enterprise in proportion that his stock bears to the entire stock and ordinarily he is entitled to participate in the management, profits and ultimate distribution of assets of the corporation.
Or, as stated differently, a share of common stock is evidence of unit ownership of the whole, each unit being of equal value such that their sum equals the value of whole. 18 C.J.S. Corporations § 515, p. 1194.
*915 Id. at 908 (emphasis added). Dreiseszun, then, finds that fair value should be assessed as enterprise value, giving plaintiffs their pro rata share of the worth of the company as a whole, without a discount for their minority status.
Plaintiffs argue that King, by its inclusion of Dreiseszun as relevant to fair value determination, indicated its endorsement of Dreiseszun's use of the enterprise level of value. However, a close examination of King suggests that the Court of Appeals did not choose to integrate Dreiseszun's enterprise level method of valuation into the court's fair value determination in this § 351.455 case. First, King did not cite or otherwise refer Dreiseszun's approval of the enterprise level of valuation; instead. King referenced Dreiseszun only as quoted supra. King could have continued its discussion of Dreiseszun by examining the court's statements about the proper method of evaluating share value, but chose, instead, to limit its use of Dreiseszun to the court's broader definition of fair value. Second, as reviewed supra, King held that the trial court's application of both a marketability or minority discount "rests in the sound discretion of the trier of fact after every relevant fact and circumstance is considered." 765 S.W.2d at 305, 306. Defendant correctly points out that if King, or any other Missouri § 351.455 decision, held that fair value necessarily equaled a dissenting shareholder's pro rata share of the corporation valued at the price a willing buyer would pay, then application of discounts could never be permitted, as by their very nature they decrease the value of shares from this enterprise level of value. Rather than arriving at such a conclusion, King reiterated that application of discounts is left to the trial court's discretion. Accordingly, this Court is not convinced by Plaintiffs' arguments that Missouri courts would value the Company at an enterprise value. The Court believes that King reveals that the Missouri Court of Appeals has not taken such a position, even when presented with the opportunity to do so by its references to Dreiseszun. Therefore, the Court concludes, again, that the question of application of marketability and minority discounts is left to its discretion as the trier of fact.
Having completed its review of relevant Missouri case law, the Court now turns to other possibly germane sources, particularly those which the parties have maintained would influence Missouri courts' decisions. The Court enters into this analysis with a cautionary note: as explained supra, this Court's task is to ascertain the legal mind of the state, not to create it; therefore, the Court's employment of non-Missouri law must be carefully constrained. Nonetheless, the paucity of Missouri case law on the question of marketability and minority discounts induces the Court to look to other jurisdictions' decisions for guidance, even if they do not constitute binding authority.
In that spirit, the Court first considers Hunter v. Mitek Industries, 721 F.Supp. 1102 (E.D.Mo.1989), the most recent judicial determination of fair value under § 351.455. At the outset, the Court points out the obvious fact that this decision is a federal district court's interpretation of § 351.455, not a state court decision, and therefore finds, in disagreement with Plaintiffs, that Hunter does not bind this Court, which must derive its § 351.455 determination on the basis of state law. Plaintiffs' reliance on Hunter stems from Hunter's use of Dreiseszun's enterprise level of valuation and consequent refusal to apply either marketability or minority discounts. 721 F.Supp. at 1106. In the court's conclusions of law, the court stated:
Under Missouri law, the dissenting shareholder is entitled to his proportionate interest or pro rata share in the overall fair value of the corporation, appraised as a going concern. Dreiseszun v. FLM Industries, 577 S.W.2d 902, 908 (Mo.App.1979).
Id. Although Hunter did not label this method of valuation, it clearly reflects an enterprise level of value. While Hunter continued by citing King's holding that *916 application of either a marketability or a minority discount in a § 351.455 fair value determination is discretionary, the court returned to Dreiseszun, pointing out the appellate court's rejection of the trial court's placing a different fair value per share based on the shares' minority or majority status. Hunter also cited Flarsheim, stating. "The purpose of the appraisal statute is to award the dissenter the value of what he owned, his proportionate interest in the going concern, in exchange for giving up his control power over significant corporate changes." Id. Reasoning that § 351.455 was designed primarily to protect dissenting shareholders and compensate them for having relinquished their control. Hunter declined to apply either discount, noting that several other courts also rejected these discounts. Id. at 1107.
This Court respectfully declines to follow Hunter, for the following reasons. As explained in its discussion of King's use of Dreiseszun, the Court finds that King did not intend to integrate Dreiseszun's use of the enterprise method of value into the court's interpretation of fair value under § 351.455. Accordingly, the Court believes that Hunter's citation of Dreiseszun for the proposition that the enterprise method of value is the proper method for a § 351.455 fair value determination does not accurately reflect Missouri law. Likewise, given that Missouri courts' most recent pronouncement under § 351.455, King, held that the application of discounts is discretionary, the Court disagrees with Hunter's reasoning that Flarsheim, a § 351.405 case, dictates a rejection of these discounts. Hunter, therefore, does not alter this Court's own interpretation of Missouri law.
The Court next considers the applicability of other states' law to its interpretation of § 351.455. Both parties insist that Missouri courts would look to the law of particular states in determining whether to apply marketability and minority discounts. Plaintiffs maintain that Missouri courts would follow Delaware law because of Delaware's experience in questions of corporate law. Delaware employs the enterprise method of value in dissenting shareholder appraisal actions and forbids courts to adjust their valuation to reflect a shareholder's individual interest in the company. Rapid-American Corp. v. Harris, 603 A.2d 796, 805 (Del.1992). To the contrary, Defendant contends that Missouri courts would rely on Illinois law, because Missouri corporate law, including § 351.455, was patterned after Illinois corporate law. Defendant relies on one recent Illinois case. Weigel Broadcasting Co. v. Smith, 289 Ill.App.3d 602, 225 Ill. Dec. 1, 682 N.E.2d 745 (1996) in which the appellate court found no error in the trial court's application of marketability and minority discounts in its determination of the fair value of dissenting shareholders' stock.
The Court's review of Missouri fair value cases reveals no discernable pattern of reliance by Missouri courts on the decisions of other state courts on the question of fair value. Phelps examined fair value cases from Delaware and New York. 293 S.W.2d at 433-434. Flarsheim included decisions from Ohio and Iowa. 432 S.W.2d at 252, 255. However, no Missouri fair value case suggests that Missouri courts ought to or do treat any other state's decision as binding authority, as both parties urge this Court to do. Instead, Missouri courts use relevant state court decisions to support their own reasoning and conclusions, but look only to Missouri precedent as binding authority. Indeed, King cites solely Missouri law in its discussion of fair value under § 351.455.
The parties battle strenuously over whether this Court should be guided by the decisions of Delaware or Illinois, and the Court will address these arguments specifically. Defendant's contention that Missouri corporate law, including § 351.455, was patterned after Illinois corporate law is affirmed by Flarsheim, in which the Court of Appeals stated. "The 1943 revision of the Missouri corporation law was patterned after the Illinois statutes. There is no essential difference between *917 the Missouri and Illinois statutes in the respects with which we are concerned." 432 S.W.2d at 252 (citations omitted). However, neither Flarsheim nor any other Missouri fair value case imbues Illinois law with the persuasive weight that Defendant would have this Court do. Moreover, Illinois law is essentially the same as Missouri law: the application of marketability and minority discounts is left to the trial court's discretion. Stanton v. Republic Bank of South Chicago, 144 Ill.2d 472, 163 Ill.Dec. 524, 581 N.E.2d 678, 682 (1991); Weigel, 225 Ill. Dec. 1, 682 N.E.2d at 750. The Court is not persuaded that Illinois's interpretation of fair value compels this Court's decision.
Plaintiffs' argument for the authority of Delaware fair value decisions fares no better. Plaintiffs assert that Delaware corporate law, including appraisal issues, is referred to by Missouri courts because of Delaware's experience in corporate law issues. As noted supra. Phelps sought guidance from Delaware law in its § 351.455 fair value determination; however, the Missouri Supreme Court did not indicate that it relied on Delaware law any more than on New York law, which the court also cited. Nor has any other fair value case suggested that Delaware law holds a place of special significance in Missouri corporate law decisions. Wilson v. Celestial Greetings, 896 S.W.2d 759, 760 (Mo.App.1995), which Plaintiffs cite in support of their argument for Delaware's importance, states only that "Delaware is a favorite state for incorporation because of its accommodative corporation code, and because of knowledgeable administrative officials and courts." The Court certainly does not interpret this description of Delaware's appeal to those seeking to incorporate a business as an endorsement of Delaware law's particular persuasiveness on Missouri courts' decisions. Thus, the Court sees no reason to grant Delaware law any significance above that of other states' fair value decisions.[9]
Having found no sound reason to rely especially on the law of any particular sister state, the Court now addresses Plaintiffs' argument of the existence a nationwide trend of disfavoring both minority and marketability discounts. Plaintiffs accurately reference a handful of commentators who conclude that a majority of courts have declined to apply marketability discounts. Also, the American Society of Appraisers has stated. "If there is a prevailing *918 direction in which recent case law seems to be moving, it is in the direction of defining fair value as a pro-rata share of the value of 100 percent of the equity." Business Valuation Selected Advanced Topics, Model 2.5 Dissenting Shareholder Actions and Fair Value, American Society of Appraisers (1997). Additionally, the American Law Institute's Principles of Corporate Governance, adopted in 1994, provide in § 7.22(a), Standards for Determining Fair Value:
The fair value of shares under § 7.21 (Corporate Transactions Giving Rise to Appraisal Rights) should be the value of the eligible holder's proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability.
Moreover, the New York Court of Appeals has concluded that "a minority discount has been rejected in a substantial majority of other jurisdictions." Friedman v. Beway Realty Corp., 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972, 977 (1995). While Plaintiffs accurately cite these authorities, the Court's review of fair value cases across the country reveals that state courts and federal courts applying state law have reached a variety of conclusions about the relationship of discounts to the fair value of a dissenting shareholder's stock.
A number of courts have held that application of discounts is discretionary and was proper in the circumstances of the case. See, e.g., Stanton v. Republic Bank of South Chicago, 144 Ill.2d 472, 163 Ill. Dec. 524, 581 N.E.2d 678, 682 (1991) (applying marketability and minority discounts); Hernando Bank v. Huff, 609 F.Supp. 1124, 1126 (N.D.Miss.1985) (applying Mississippi law and applying minority discount without discussion of marketability discount); Atlantic States Constr., Inc. v. Beavers, 169 Ga.App. 584, 314 S.E.2d 245, 251 (1984) (applying minority discount but not marketability discount); Perlman v. Permonite Mfg. Co., 568 F.Supp. 222, 231 (N.D.In.), aff'd 734 F.2d 1283 (7th Cir.1984) (applying Indiana law and applying both discounts); Moore v. New Ammest. Inc., 6 Kan.App.2d 461, 630 P.2d 167, 177 (1981) (applying minority discount without discussion of marketability discount). Some courts have decided that a marketability discount was appropriate, while a minority discount was not. See, e.g., Friedman, 638 N.Y.S.2d 399, 661 N.E.2d at 976-77; Columbia Management Co. v. Wyss, 94 Or.App. 195, 765 P.2d 207, 212-14 (1989); Blake v. Blake Agency, Inc., 107 A.D.2d 139, 149, 486 N.Y.S.2d 341 (1985); Ford v. Courier-Journal Job Printing Co., 639 S.W.2d 553, 556 (Ky. App.1982). Several courts have adopted the view that a minority discount should not be applied in valuing stock held by dissenting shareholders. See, e.g., Foy v. Klapmeier, 992 F.2d 774, 781 (8th Cir. 1993) (applying Minnesota law); Woolf v. Universal Fidelity Life Ins. Co., 849 P.2d 1093, 1095 (Ok.App.1992); Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1145 (Del. Sup.1989); Woodward v. Quigley, 257 Iowa 1077, 133 N.W.2d 38, 44 (1965). In Robblee v. Robblee, 68 Wash.App. 69, 841 P.2d 1289, 1295 (1992), the court held that minority discount would be appropriate if a third party had bought the minority shares, but not in this case, where the shares were purchased by the majority shareholder. Other courts have rejected both minority and marketability discounts. See e.g., Rigel Corp v. Cutchall, 245 Neb. 118, 511 N.W.2d 519, 526 (1994): Re Valuation of Common Stock of McLoon Oil Co., 565 A.2d 997, 1004 (Me.1989) Still other courts, without specifically addressing a minority discount or a deduction for marketability, have held that the stock of the dissenting shareholder should be valued as a proportion of the entire corporation's value without giving any consideration to diminished marketability. See, e.g., BNE Massachusetts Corp. v. Sims, 32 Mass.App.Ct. 190, 588 N.E.2d 14, 19 (1992).
While this multiplicity holdings makes it possible for each party to find decisions strongly supporting its stance on the question of discounts, they do not provide clear *919 guidance for this Court. These various opinions may yet be very useful to the Court, however, in delineating the reasons why courts have chosen to apply or declined to apply marketability and minority discounts.
Courts which approve the application of minority discounts typically focus on minority shareholders' lack of control over corporate decisions. In Hernando Bank, the court was "unconvinced that a minority share of stock should be valued as though it were a controlling share of a corporation." 609 F.Supp. at 1126. Moore quoted an expert witness's testimony that first, a minority shareholder could not have expected to receive a proportionate share of the going concern value of the corporation if he had remained a stockholder, unless the assets as a whole, or the company as a whole, were to be sold; and second, a minority stockholder would have had no voice in a corporate policy, and no power to influence decisions as to whether and under what conditions to sell. The witness testified further that as a consequence of this lack of control, a minority block of shares has a lower share value. Moore concluded. "Where it is clear that the acquisition of a minority group of stock would not result in the procurement of a controlling interest in a corporation, the value of such stock generally would reflect a lower value than if its purchase resulted in a controlling interest," and approved the application of a minority discount. 630 P.2d at 177.
Thus, these courts take into account the status of the particular shares to be valued, rather than simply valuing the company as a whole and calculating dissenting shareholders' shares on a pro rata basis. Atlantic States explained,
We do not agree with the trial court's conclusion that consideration of the minority nature of the dissenting shareholder's interest is against public policy. We have previously stated that the trial court must consider any factor bearing on the stock's intrinsic worth. The focus of the valuation process is on the value of the stock held by the dissenting shareholders, not on the value of some specified percentage of the corporate worth. If in a given case the minority nature of the interest diminishes the worth of the stock itself, there is nothing we can find in the statutory appraisal scheme that would prevent the trial court from considering the "minority interest" factor and devaluing the stock accordingly. Presumably, a dissenting shareholder took any relevant "minority interest" factor into account when he purchased the stock. Failure to account for that factor in the appraisal process would unfairly compensate the shareholder for "value" not properly attributable to his shares of stock.... Courts must also take care to consider a "minority interest" factor only when relevant to the fair value of the stock under consideration. This is a determination that must be made by the trial court under the evidence presented.
314 S.E.2d at 251. Similarly, in Perlman the court explained that although plaintiffs' pro rata share of the company was a relevant factor in determining the fair market value of plaintiffs' shares, that figure was only a starting point, from which the court must proceed to adjust the shares to reflect their minority interest. 568 F.Supp. at 231.
Several courts have found that application of a marketability discount is appropriate in a particular case. Lawson Mardon Wheaton explains that,
In general, the concept of a marketability discount stems from the fact that marketability problems often affect shares of closely-held corporations, and that as a result, a discount should be applied to reflect the illiquidity of such shares. This illiquidity is the result of the fact that there is no large pool of potential buyers for these businesses when they come on the market; consequently, the longer it takes to sell an asset, the lower its ultimate value will be and such businesses must be sold at a *920 substantial discount in order to attract buyers.
716 A.2d at 561. In Columbia Management, the court affirmed the trial court's application of a marketability discount, reasoning that this discount was adequate to reflect the potential volatility in the company's enterprise value and the fact that its asset value was considerably less than its enterprise value. 765 P.2d at 213. The court pointed out that while the enterprise value was the best way to value the company as a whole, the value of this particular company primarily reflected its success in developing strong employee and client relationships. Finding that such a value was less stable than that of a business with tangible products and a less volatile market, the court concluded that a marketability discount was appropriate. The court also factored the lack of marketability of the shares of this closely held corporation into its judgment. Id. Similarly, Blake reasoned that application of a marketability discount was an appropriate way to adjust share price to reflect the difficulty of selling the shares of a closely held corporation on a public market. 107 A.D.2d at 149, 486 N.Y.S.2d 341. Also, Ford Courier held that an appraiser could apply a marketability discount to indicate the weight given to the stock's market value in computing fair value. 639 S.W.2d at 556. Thus, courts which apply a marketability discount do so primarily to reflect the illiquidity of the shares of the company being valued.
Courts which reject marketability or minority discounts, or which decline to apply either discount, generally give similar reasons for their decision, regardless of the particular discount in question.[10] Their position is most prominently stated in Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1144-45 (Del.1989):
In rejecting a minority or marketability discount, the Vice Chancellor concluded that the objective of a [dissenter's statute appraisal] is "to value the corporation itself, as distinguished from a specific fraction of its shares as they may exist in the hands of a particular shareholder." We believe this to be a valid distinction. A proceeding under Delaware's appraisal statute requires that the Court of Chancery determine the "fair value" of the dissenting stockholders' shares. The fairness concept has been said to implicate two considerations: fair dealing and fair price. Since the fairness of the merger process is not in dispute, the Court of Chancery's task here was to value what has been taken from the shareholder: "viz. his proportionate interest in a going concern." To this end the company must be first valued as an operating entity by application of traditional value factors, weighted as required, but without regard to post-merger events or other possible business combinations. The dissenting shareholder's proportionate interest is determined only after the company as an entity has been valued. In that determination the Court of Chancery is not required to apply further weighting factors at the shareholder level, such as discounts to minority shares for asserted lack of marketability. ... Where there is no objective market data available, the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty *921 for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.
(citations omitted). Likewise, McLoon reasoned:
In the statutory appraisal proceeding, the involuntary change of ownership caused by a merger requires as a matter of fairness that a dissenting shareholder be compensated for the loss of his proportionate interest in the business as an entity. The valuation focus under the appraisal statute is not the stock as a commodity, but rather the stock only as it represents a proportionate part of the enterprise as a whole. The question for the court becomes simple and direct: What is the best price a single buyer could reasonably be expected to pay for the firm as an entirety? The court then prorates that value for the whole firm equally among all shares of its common stock. The result is that all of those shares have the same fair value.... Especially in fixing the appraisal remedy in a close corporation, the relevant inquiry is what is the highest price a single buyer would reasonably pay for the whole enterprise, not what a willing buyer and a willing seller would bargain out as the sales price of a dissenting shareholder's shares in a hypothetical market transaction. Any rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule would inevitably encourage corporate squeeze-outs.
These courts premise their holdings on their interpretation of dissenters' rights statutes, which they construe as requiring that these shareholders receive their proportionate interest in the corporation as a going concern, without adjustment to reflect the status of shares and with an assumption that there is a market  at least one willing buyer  for the corporation as a whole.
Defendant correctly points out that decisions like these in which courts have held that application of discounts necessarily violates the intent of dissenters' rights statutes do not mandate this Court's decision. King unequivocally holds that the application of discounts is within the trial court's discretion. Thus, cases which direct valuation of the dissenter's shares at the enterprise level of value, without application of either discount, could not be applied, in such absolute terms, by this Court, as the very reasoning of such holdings is that discounts are never appropriate (or only in extraordinary circumstances when dissenting shareholders have exercised their rights solely to manipulate the value of their shares. See, e.g., Lawson Mardon Wheaton, Inc. v. Smith, 315 N.J.Super. 32, 716 A.2d 550, 565-67 (1998) (applying marketability discount because of extraordinary circumstances)). King obviously rejects such an absolute stance against discounts by its very holding that courts' decision to apply discounts is discretionary.
With the preceding analysis in mind, the Court now turns to the question of whether application of marketability or minority discounts is appropriate in this case. Because the parties' experts valuations of the Company reflected a marketable minority interest value, rather than the Company's enterprise value, the question of application of a minority discount is translated in this case to a question of application of a control premium. That is, a minority discount is already imbedded into the experts' valuations of the Company insofar as those valuations are based on the share prices of guideline publicly traded companies. Because public securities are sold on a per share basis, their public market value is a minority interest value. In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc., 725 A.2d 927, 935 (Vt.1999). As the Superior Court of New Jersey recently explained,
The embedded or inherent minority discount reflects the reduction in the overall *922 liquid freely-traded value placed on share value because the traded shares are minority shares. This discount is distinguishable from a control premium, although they may be said to represent two sides of the same coin, with the control premium representing the added value of owning or purchasing ownership of a controlling block of shares. A control premium has been defined as the added amount an investor is willing to pay for the privilege of directly influencing the corporation's affairs. 18A AM. JUR.2D Corporations § 795 (1985).
Lawson Mardon Wheaton, 716 A.2d at 568.
No case has addressed the application of a control premium in a § 351.455 context; therefore, it is difficult for this Court to know how a Missouri court might address this question. The Court does know, nevertheless, that in King the Court of Appeals approved the trial court's application of a minority discount because it reflected plaintiff's "lack of a controlling voice" in the company. 765 S.W.2d at 306. In this case, Plaintiffs also lack a controlling voice in the Company. The non-family member shareholder group, of which Plaintiffs are a part, control only 7% of the Company's shares and thus have little or no influence over significant corporate decisions and change. Therefore, the Court believes that application of a minority discount would be reasonable in this case. Accordingly, under current Missouri case law, the Court finds that application of a control premium to valuations of Plaintiffs' shares on a minority interest basis is not appropriate in light of the evidence presented.
However, the Court does not believe that a marketability discount is also warranted. Section 351.455 specifically provides that minority shareholders can go to the courts for determination of the fair value of their shares; thus, the court action creates a market for those shares. The Company's merger forced Plaintiffs to give up their right of ownership by selling their shares to the Company. In doing so, the minority shareholders, who had no desire to sell their shares and no right to reject the sale, lost their opportunity for future appreciation of these shares. The Court believes that Plaintiffs should not be further penalized by being denied receiving what § 351.455 calls for, a fair value for their interest. To apply a marketability discount would inequitably deny Plaintiffs the fair value of their shares, while unjustly enriching Defendant, who would put unanimous control of the Company in the hands of the family member shareholders at a substantially discounted cost. For these reasons, the Court declines to apply a marketability discount.
On an estimation of value of the Company's common equity on a minority ownership interest basis, by the guideline publicly traded company method, Mr. Reilly values the Company at $1,008,000,000. His value for the Company by the direct capitalization method is $849,000,000 and by the discounted cash flow method on consolidated basis is $1,088,000,000. As explained supra, the Court will not accept his valuation of the Company as a marketable controlling ownership interest, or on a control or enterprise value basis, because the Court believes that given the evidence in this case and under the applicable law, such a valuation is not justified.
Mr. Patton's valuation of the Company on a non-marketable minority interest basis is $404,199,000. As detailed above, the Court rejects the imposition of a marketability discount as unreasonable and unjustified under the evidence of this case and as unsupportable under the applicable law. Mr. Patton's common equity marketable minority interest valuation for the Company is $621,844,000.
The Court will not restate here all of the reasons for concluding that the Reilly valuations are too high or that the Patton valuations are too low. The Court has been favored with substantial material by all expert witnesses and recognizes the intensity of the level of advocacy that pervades the complexities of this case. The efforts of the experts and exceptional *923 counsel on both sides produced an excellent record for the Court's benefit.
The Court concludes that the fair value of the total common equity of Siegel-Robert, Inc, on a marketable minority interest basis is $853,250,000.00. The Plaintiffs are lawfully entitled to receive $63.36 for each of their shares from Defendant.

V. INTEREST AND ATTORNEY FEES
Section 351.455 provides that dissenting shareholders are entitled to a judgment for the "fair value [of their shares] as of the day prior to the date on which such vote was taken approving such merger or consolidation, together with interest thereon to the date of such judgment." Plaintiffs interpret this language to mean that dissenting shareholders are to receive prejudgment interest; the Court agrees. Section 351.455 does not, however, specify the rate of interest. Furthermore, no Missouri court has considered the proper rate of prejudgment interest in a § 351.455 case.[11] Plaintiffs assert that pursuant to R.S.Mo. § 408.020, the Court should award nine percent interest on its judgment. The Court disagrees.
§ 408.020 provides that when no rate of interest is agreed upon, nine percent is the appropriate legal interest; however, Missouri courts have clearly held that § 408.020 prejudgment interest ordinarily is denied unless a claim for damages is either liquidated or "readily ascertainable by computation or by determination according to a recognized standard." U.S., For Use and Ben. of Conner Universal Co., Inc. v. Dimarco Corp., 985 F.2d 954, 959 (8th Cir.1993) (applying Missouri law). Because the entire purpose of Plaintiffs' case is to determine the value of their shares, it would be nonsensical to suppose that their damages are either liquidated or readily ascertainable. Accordingly, the Court agrees with Defendant that § 408.020 does not apply in this case.
In the absence of a statutory rate, Plaintiffs suggest that an appropriate rate would reflect the rate Plaintiffs would have earned had they had the use of the funds and invested them prudently during the last year and a half, for instance, the annualized rate of return for the S & P 500 of 17.89% during that time period. In contrast, Defendant asserts that the proper rate of interest should be 5% to 5.5%, the approximate rate of interest earned by the Company during the period of July 31, 1997 through December 31, 1998. Courts determining the proper rate of interest in dissenting shareholders' fair value cases have looked to a variety of sources in making their decision. See, e.g., Chokel v. First National Supermarkets, Inc., 421 Mass. 631, 660 N.E.2d 644, 652 (1996) (noting that "[b]ond ratings are an approved basis for measuring the amount of interest to be awarded," and finding no error in the trial court's use of the AAA corporate bond rate of 11.13%, with interest paid semi-annually, to award prejudgment interest of 12%); McLoon, 565 A.2d at 1006 (affirming referee's choice of 8% interest rate because percentage fell at the approximate middle of the range of earnable interest rates  more than savings accounts and less than commercial paper); Armstrong v. Marathon Oil Co., 32 Ohio St.3d 397, 513 N.E.2d 776, 797 (1987) (in determining proper interest rate, trial court should consider prevailing rate of interest for various types of loans, the average prime rate during that period, and so forth).
This Court believes that the 52-Week T-Bill rate, set forth in 28 U.S.C. § 1961, is an appropriate rate of interest in this case. § 1961 provides a basic rate of interest for money judgments on civil cases before district courts. Taking the average of this 52-Week T-Bill rate from July 30, 1997 through the date of this *924 Order, the Court sets the rate of prejudgment interest at 5.115%.
The Court must also consider whether this interest shall be simple or compound. Missouri courts have not addressed this issue in a § 351.455 context. Plaintiffs assert that the interest should be compound to compensate for the inequity that would otherwise result if the corporation enjoys use of the shareholders' money during the pendency of the litigation. Plaintiffs contend that compound interest is particularly appropriate in this case because Defendant did not consult with an appraiser or independent adviser before offering $20 per share to the dissenting shareholders. Plaintiffs argue that because even Defendant's expert valued the shares at well over $20.00 ($46.20), this lawsuit might have been avoided had Defendant consulted an appraiser before making its offer. Defendant responds that Missouri courts typically reserve awards of compound interest for situations in which a party has engaged in wrongdoing and assert that Plaintiffs have made no showing of wrongful conduct in this case.
Missouri courts define compound interest as "interest upon interest; where accrued interest is added to the principal sum and the whole treated as a new principal for the calculation of interest for the next period." Lammers v. Lammers, 884 S.W.2d 389, 393 (Mo.App.1994) (quoting Wallemann v. Wallemann, 817 S.W.2d 548, 549 (Mo.App.1991)). Missouri courts award compound interest in only two situations:
First, trial courts, sitting as courts of equity, may assess compound interest when justice requires it to serve the cause of equity. Second, compound interest is allowed if the parties consent to it in the contract or agreement in question.
Id. Only the first situation would apply in this case. Furthermore, it is not apparent to the Court that this case is indeed an equity case. Missouri courts usually distinguish between legal and equitable actions by looking to the remedy requested. Hammons v. Ehney, 924 S.W.2d 843, 846 (Mo.1996) (en banc). Generally, requests for money judgment are legal actions, while requests for other types of court orders are equitable actions. Id. Here, Plaintiffs request a money judgment of the fair value of their shares. Missouri courts also hold that "equity will not intercede if there is an adequate remedy at law"; that is, if a common law or statutory remedy exists. Id. at 847. Here, § 351.455 provides a statutory remedy for dissenting shareholders through a judicial determination of fair value. For these reasons, this Court believes that this case is a legal action, rather than an equitable one.
Moreover, even if this case is an equity case, the Court finds that compound interest is not warranted. In Knopke v. Knopke, 837 S.W.2d 907, 916 (Mo.App.1992), the Court of Appeals found that the trial court had not erred in declining to compound the interest awarded. The court stated. "Apparently the trial court did not view the conduct of [the defendants] as that character of aggravated conduct which justified the annual compounding of interest." Id. This Court finds that Defendant did not engage in the sort of aggravated conduct that would justify compound interest. Mr. Anderson decided on the $20.00 share price after some evaluation and calculation. Although he did not consult any outside appraisers, the Court believes that his decision based on his intimate knowledge of the Company was not the sort of frivolous decision that might constitute aggravated conduct. Accordingly, the Court shall award 5.115% simple interest.
Finally, the Court must address Plaintiffs' request for attorney's fees. Plaintiff argue that this case presents "very unusual circumstances" justifying an award of attorney's fees. Like their request for compound interest, Plaintiffs argue here that Mr. Anderson failed to satisfy a minimal standard of fiduciary duty to the shareholders to evaluate the adequacy of the merger consideration when he offered $20.00 per share without consulting *925 any independent appraiser or financial adviser. Defendant, however, contends that this case is not unusual, as it was brought under a long-standing Missouri corporate statute, and that it was not more complicated or expensive than other complex corporate litigation.
In a recent case, The Missouri Court of Appeals discussed attorneys fees awards as follows:
Missouri has adopted the "American Rule" which provides that litigants are to bear the expense of their own attorney's fees. Attorney's fees may be recovered, however, if the situation falls within one of the following categories: (1) recovery pursuant to contract or provided by statute; (2) recovery as damages to a wronged party involved in collateral litigation; or (3) reimbursement ordered by a court of equity to balance benefits. The equitable balancing of benefits by awarding attorney's fees occurs only if "very unusual circumstances" can be shown. "Very unusual circumstances," as it relates to the reimbursement of attorney's fees, has been interpreted to mean an unusual type of case or unusually complicated litigation. "Balancing of benefits" under "very unusual circumstances" has been confined to very limited fact situations.
In re Morrison, 987 S.W.2d 475, 478 (Mo. App.1999) (citations omitted). In this case. Plaintiffs cannot recover attorney's fees pursuant either to contract or to statute, because § 351.455 does not provide for a recovery of attorney's fees. Nor does this case involve any collateral litigation. While the parties appear to assume that this in an equity case, this Court is not certain that it is, for the reasons outlined supra. Assuming, arguendo, that this is an equity case, the Court finds that this case is neither sufficiently unusual nor sufficiently complicated to warrant an award of attorney's fees. While Mr. Anderson's determination that $20.00 was an appropriate share price certainly could have been more carefully ascertained. Missouri courts have not required that corporations follow any particular procedures in determining the amount to pay dissenting shareholders for their shares. The remedy available under Missouri law to such shareholders is § 351.455, which Plaintiffs have fully employed. Plaintiffs are entitled to costs of the action, to be determined upon filing of a bill of costs.
Accordingly.
IT IS HEREBY ORDERED that Plaintiffs shall have judgment against Defendant for $63.36 per share, with 5.115% simple interest from July 30, 1997, through the date of this Order.
IT IS FURTHER ORDERED that Plaintiffs' prayer for attorney's fees is DENIED and that their claim for costs will be considered upon filing of a bill of costs.
NOTES
[1] Plaintiff's owning the following number of shares of stock in Siegal-Robert, Inc., a Missouri corporation, on July 30, 1997, are Thomas A. Swope, 13,200; Judy N. Swope, 13,200; the Estate of O.W. Schneider, Jr., by personal representatives Tracy Leigh Schneider Morris and O.W. Schneider, III, 336,500; Kris Douglas Schneider, 16,000; Mark William Schneider, 16,000; Tracy Leigh Schneider, 16,000; and O.W. Schneider, III, 16,000.
[2] Siegel-Robert, Inc., a Nevada corporation incorporated under the laws of the State of Nevada on July 21, 1997, which gained authority to do business in the State of Missouri on August 5, 1997, is the surviving corporation after a merger between that corporation and Siegel-Robert, Inc., a Missouri corporation, which occurred July 31, 1997. Shareholders were notified on July 21, 1997, of the impending merger vote on July 31, 1997.
[3] Forty Robert family shareholders control 93% of the shares, and 23 shareholders who are non-family members control 7% of the shares. There are 13,464,832 total outstanding shares of which the Robert family owns 12,498,572.
[4] Acro Molded Products, Inc., Pompano Beach, Florida, is in the business of manufacturing precision moldings  custom plastic injection moldings, and parts for cellular telephones. Motorola is its largest customer. The company also builds wire harnesses for car mirrors and moldings for medical components. It is not listed as a separate division, and for financial analyses is included in the Automotive Appliance Division.
[5] EBITDA is an acronym for earnings before interest, taxes, depreciation and amortization.
[6] Courts also describe this level of value as the value of the company as a "going concern," defined as "the price a knowledgeable buyer would pay for the entire operation." Sarrouf v. New England Patriots Football Club, Inc., 397 Mass. 542, 492 N.E.2d 1122, 1125 (1986).
[7] Flarsheim applied § 351.405 to a sale in dissolution, rather than a sale of assets, reasoning that both corporate events operate to terminate the business. Id. at 253.
[8] In its review of Missouri's § 351.455 cases, the Court includes no substantive discussion of Kirtz v. Advanced Instruments, Inc., 581 S.W.2d 868 (Mo.App.1979). The Court's review of this case revealed nothing helpful to its understanding of Missouri court's approach to § 351.455 fair value determinations.
[9] In their trial brief, Plaintiffs assert that § 351.455 substantially follows the Revised Model Business Corporation Act ("RMBCA"). §§ 13.30 and 13.01. Defendants responded to this argument by presenting the legislative history of the Missouri General Assembly's most recent revision of the state's corporate law. The Final Report of the House Interim Committee to Study Missouri Corporation Laws (March, 1990) ("Report") explains that in 1986 a subcommittee of the Missouri Bar's corporate committee began to search for a comprehensive set of statutes which could completely replace Chapter 351. The Report states that the subcommittee ultimately chose the RMBCA as its model; however, the House Interim Committee decided to retain existing law (which was based on the Illinois Business Corporations Act of 1933, adopted by Missouri in 1943) in several aspects, including sections governing "dissenters' rights." Plaintiffs have neither refuted nor called into question Defendant's presentation of this legislative history. Based on these arguments and the Court's research, the Court finds that § 351.455 was based on Illinois law when passed in 1943, and that the Missouri legislature followed the Interim Committee's recommendation not to revise it when approving House Bill No. 1432 (1990).

The Report also remarks that after considering the Delaware Corporations Act, the subcommittee decided that it would not be a suitable replacement for Chapter 351, because aspects of Delaware's law were dated and because the subcommittee was concerned that such a change would require Missouri courts to rely heavily on Delaware courts' decisions. Defendant asserts that this statement in the Final Report indicates the Missouri legislature's intention to reject Delaware law. The Court sees no reason to interpret this statement as an outright rejection of the reasoning of Delaware's courts, especially since this recommendation was made by a Missouri Bar subcommittee, not by the General Assembly. Accordingly, the Court will give Delaware law the same persuasive weight which it has carried with Missouri courts in their previous fair value decisions.
[10] An exception to this general rule appears when courts apply a marketability discount, but not a minority discount. These courts emphasize that a marketability discount affects the values of all shares of a corporation, while application of a minority discount depends on the status of the shares as minority or majority. See, e.g., Columbia Management, 765 P.2d at 214; Blake, 107 A.D.2d at 149, 486 N.Y.S.2d 341.
[11] In Hunter the court awarded prejudgment interest at a rate of nine percent but offered no reasons for this choice.